## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

| | |
|---|---|
| CMS CONTRACT MGMT. SVCS., ET AL., | Case No. 12-852C, 12-853C, 12-862C, 12-864C, and 12-869C |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | Judge Wheeler |
| Defendant. | |

## PLAINTIFF SOUTHWEST HOUSING COMPLIANCE CORPORATION'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Plaintiff Southwest Housing Compliance Corporation ("SHCC"), through the undersigned counsel, hereby opposes the Defendant's January 4, 2013 motion to dismiss and for judgment on the administrative record, and submits this cross-motion for judgment upon the administrative record.

Richard J. Vacura
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102
(703) 760-7764
(703) 760-7349 (fax)

*Counsel of Record for Plaintiff Southwest Housing Compliance Corporation*

Of Counsel:

Tina D. Reynolds
K. Alyse Latour
MORRISON & FOERSTER LLP

Dated: January 18, 2013

## TABLE OF CONTENTS

I.     **INTRODUCTION** ......................................................................................1

II.    **QUESTIONS PRESENTED** .......................................................................2

III.   **STATEMENT OF THE CASE AND FACTUAL BACKGROUND** ...........2

    A.    Nature of the Case ...............................................................................2

    B.    Background Facts .................................................................................3

          1.    HUD's Section 8 Project-Based Housing Assistance Program ..................3

          2.    HUD's 2011 Invitation for Submission of Applications ...........................3

          3.    HUD's 2012 Notice of Funding Availability ...........................................4

          4.    The 2012 GAO Protests ......................................................................5

          5.    HUD's Response to the GAO's Recommendations ..................................5

IV.   **ARGUMENT** ..........................................................................................6

    A.    HUD Must Obtain PBCA Contract Administration Services Through A Procurement Contract. ......................................................................6

          1.    HUD's actions are inconsistent with the Government's assertion that HUD is statutorily prohibited from administering the HAP contracts. ......................................................................................7

          2.    Regardless of whether HUD is statutorily required to use PHAs to administer the Section 8 HAP contracts, the vehicle HUD has chosen to use falls within the definition of a "procurement contract" under federal law ......................................................11

    B.    Even If The Court Finds That The NOFA Is A Cooperative Agreement, The Restrictions Contained In The NOFA Are Unreasonable. ...........................20

    C.    SHCC Is Entitled To Declaratory And Injunctive Relief. ....................................24

    D.    SHCC Is Entitled To Fees And Costs. .................................................................26

V.    **CONCLUSION** ......................................................................................**26**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*360Training.com, Inc. v. U.S.*,
104 Fed. Cl. 575 (2012) ................................................................................. 13, 14, 20

*Altria Group v. Good*,
555 U.S. 70 (2008) ....................................................................................................... 22

*Bean Dredging Corp. v. United States*,
22 Cl. Ct. 519 (1991) .................................................................................................. 25

*BINL, Inc. v. United States*,
106 Fed. Cl. 26 (2012) .................................................................................................. 2

*Mangi Environmental Grp., Inc. v. United States*,
47 Fed. Cl. 10 (2000) .................................................................................................. 25

*Overstreet Elec. Co., Inc. v. United States*,
47 Fed. Cl. 728 (2000) ................................................................................................ 25

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) ................................................................................ 24

*Seattle Sec. Servs., Inc. v. United States*,
45 Fed. Cl. 560 (1999) ................................................................................................ 25

*Southwest Housing Compliance Corp.*,
B-406738.5, Aug. 15, 2012, 2012 CPD ¶ 236 .......................................................... 1

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) .................................................................................. 2

**STATUTES**

28 U.S.C. § 1491(b)(1) ............................................................................................. 2, 6

28 U.S.C. § 1491(b)(2) .......................................................................................... 24, 26

31 U.S.C. § 3554(b)(3) ................................................................................................. 6

31 U.S.C. § 6301(3) .................................................................................................... 20

31 U.S.C. §§ 6301-6308 ............................................................................................... 2

31 U.S.C. § 6303 .................................................................................................. 12, 13

31 U.S.C. § 6305 ..................................................................................................... 13

41 U.S.C. § 3301 ....................................................................................................... 1

42 U.S.C. § 1437f(a)(1)(C)..................................................................................... 12

Housing Act of 1937, 42 U.S.C. § 1437f *et seq.* ................................................passim

Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88
    Stat. 633, 662 (1974) (codified at 42 U.S.C. 1437f, § 8)....................................7, 8

Housing and Urban-Rural Recovery Act of 1983, Pub. L. 98-181, §209(a)(2), 97 Stat.
    1153, 1183 (1983) ...............................................................................................8

Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-
    65, Title V, § 524, 111 Stat. 1344 (1997)..........................................................9

Pub. L. No. 75-412, 50 Stat. 888, 891 (1937) ..........................................................7

Pub. L. No. 97-162 .................................................................................................. 14

## OTHER AUTHORITIES

24 C.F.R. § 5.403..................................................................................................... 12

24 C.F.R. § 880.501 *et seq.* ..................................................................................... 17

24 C.F.R. § 982.54(a) .............................................................................................. 15

24 C.F.R. § 982.157................................................................................................. 15

24 C.F.R. § 982.201................................................................................................. 15, 16

24 C.F.R. § 982.305(a) ............................................................................................ 16

S. REP. NO. 97-180 (1981), 1982 U.S.C.C.A.N. 3................................................. 14

GAO Office of General Counsel, Principals of Federal Appropriations Law (3d Ed. 2006) ....... 14

## I.     INTRODUCTION

The subject of this pre-award bid protest is the latest attempt by the U.S. Department of Housing and Urban Development ("HUD") to flout federal procurement laws and regulations after choosing to disregard the U.S. Government Accountability Office's ("GAO") recommendation that HUD cancel its Notice of Funding Availability, Docket No. FR-5600-N-33 ("NOFA") and conduct the proposed acquisition through a procurement that results in the award of a contract.  *Southwest Housing Compliance Corp.*, B-406738.5, Aug. 15, 2012, 2012 CPD ¶ 236.[1]  Not only has HUD violated federal statutes and federal procurement regulations, but also its own policies, by issuing the NOFA and intending to award cooperative agreements for contract administration services for the Performance-Based Contract Administrator ("PBCA") Program.  The NOFA issued by HUD improperly contemplates the issuance of cooperative agreements instead of procurement contracts to obtain PBCA contract administration services. Moreover, the NOFA unduly restricts competition by placing unjustifiable and unnecessary requirements on out-of-state applicants, essentially creating a sole source environment that improperly limits competition to a single approved in-state applicant, in violation of the Competition in Contract Act of 1984, 41 U.S.C. § 3301 ("CICA").

Accordingly, SHCC, requests that this Court deny the Government's January 4, 2013 Motion to Dismiss and Request for Judgment on the Administrative Record ("Govt MTD"), and respectfully moves this Court to grant Plaintiff's Cross-Motion for Judgment on the Administrative Record and to permanently enjoin Defendant the United States, acting through HUD ("Defendant" or the "Government"), from making an award under the NOFA.

---

[1] The Protest of Southwest Housing Compliance Corporation was consolidated with a number of other protests.

## II.   QUESTIONS PRESENTED

1.   Whether the "annual contributions contracts" to be entered into between HUD and the PHAs under the NOFA are "procurement contracts" subject to the jurisdiction of this Court pursuant to the Tucker Act.

2.   Whether the restrictions on competition set forth in the NOFA are reasonable.

3.   Whether injunctive relief is warranted to correct the flaws in the NOFA.

## III.   STATEMENT OF THE CASE

### A.   Nature of the Case

In this pre-award bid protest, SHCC contends that the terms of the NOFA violate applicable statutes and regulations, specifically, the Federal Grants and Cooperative Agreements Act ("FGCAA"), 31 U.S.C. §§ 6301-6308, and CICA.  SHCC also contends that HUD's decision that it would not follow GAO's August 15, 2012 recommendation regarding this NOFA was arbitrary and capricious.[2]

SHCC seeks permanent injunctive relief to enjoin HUD from awarding contracts pursuant to the NOFA.  In addition, SHCC seeks a declaration:  (1) that HUD's express disregard of the GAO's decision was improper, arbitrary, and capricious; (2) that HUD's use of the NOFA to issue cooperative agreements for contract administration services for the PBCA Program is improper and contrary to law; and (3) that HUD should obtain PBCA Program services through a competitive procurement that results in the award of a procurement contract.  In the alternative, SHCC seeks: (1) a declaration that the NOFA is unduly restrictive; and (2) preliminary and permanent injunctive relief preventing HUD from proceeding under the NOFA and directing that

---

[2] As shown in the Complaint, SHCC, as an incumbent contractor and prospective offeror, will suffer a non-trivial competitive injury if these errors are not corrected.  Consequently, SHCC has standing to bring this pre-award bid protest.  *See* 28 U.S.C. § 1491(b)(1) ; *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 38-39 (2012).

HUD must revise the NOFA to remove the restrictions on out-of-state competition.

### B. Background Facts

#### 1. HUD's Section 8 Project-Based Housing Assistance Program

Section 8 of the U.S. Housing Act of 1937 authorizes HUD to provide rental assistance in the form of various types of subsidies. Through the Project-Based Housing Assistance Program, HUD provides Section 8 rental subsidies to property owners in accordance with the terms of Housing Assistance Payment ("HAP") contracts, which HUD enters into directly with the property owner. U.S. Housing Act of 1937, 42 U.S.C. § 1437f *et seq.* (the "1937 Act"). From the inception of the Project-Based Section 8 Rental Assistance Program in 1974, and until 1999, HUD administered a majority of the HAP contracts through its own employees. In response to governmental criticism of HUD's ability to successfully administer these contracts, in 1999, HUD began outsourcing the contract administration functions to third-parties through competitive procurements. The outsourcing was accomplished through a performance based contracting system, known as the PBCA Program. Since 1999, HUD has entered into numerous "annual contributions contracts" ("ACCs") with public housing agencies ("PHAs") to perform contract administration of the project-based HAP contracts under the PBCA Program.

SHCC was one of the third-parties that received an ACC from HUD to perform these contract administration services. SHCC has been providing these services under ACCs in Texas and Arkansas for more than ten years. As the PBCA in these states, SHCC currently administers on behalf of HUD 855 HAP contracts and 60,747 units that provide project-based Section 8 housing to low-income residents.

#### 2. HUD's 2011 Invitation for Submission of Applications

Beginning in 2007, HUD continually indicated that it intended to hold an open competition to re-compete the ACCs. On February 25, 2011, HUD issued an Invitation for

Submission of Applications ("2011 Solicitation") for PBCA administrative services in all states.

Notably, the 2011 Invitation  specifically encouraged PHAs to submit applications in multiple

states.  AR at 522-543.  SHCC submitted applications for eight states, and was awarded PBCA

contracts for five of these states.  SHCC protested two of the contracts for which it did not

receive an award.  Due to an overwhelmingly large number of protests at GAO, HUD withdrew

the contract awards in 42 states, including the five awarded to SHCC.  In the 11 states where

there was no competition because there was only one bidder, HUD awarded a contract to each

such sole bidder.  In August 2011, HUD announced that it would re-compete the same PBCA

administrative services in the other 42 states, but would procure the services through a Notice of

Funding Availability.  AR at 220; AR at 549.

### 3.       HUD's 2012 Notice of Funding Availability

On March 9, 2012, HUD released the NOFA at issue in this bid protest.  AR at 1258-

1417.  The NOFA solicits applications for eligible PHAs to provide the PBCA administrative

services in each of the 42 states in which HUD previously did not award an ACC.  In the NOFA,

HUD has declared, for the first time in the history of the 12-year PBCA Program, that, "[t]he

ACCs that HUD seeks to award via this NOFA are cooperative agreements," despite the fact that

the substance of the administrative services to be provided under the NOFA are unchanged from

the administrative services provided under previous ACCs issued for the PBCA Program.  AR at

1264.

Also for the first time, HUD has included in the NOFA new and undue restrictions on

competition that violate CICA.  Specifically, the NOFA states the following:

> HUD believes that nothing in the 1937 Act prohibits an
> instrumentality PHA that is 'authorized to engage in or assist in the
> development or operation of public housing' within the meaning of
> section 3(b)(6)(A) of the 1937 Act from acting as a PHA in a
> foreign State.  However, HUD will consider applications from out-

4

> of-State applicants *only* for States which HUD does not receive an
> application from a legally qualified in-State applicant.  Receipt by
> HUD of an application from a legally qualified in-State applicant
> will result in the rejection of any applications that HUD receives
> from an out-of-State applicant for that state.

AR at 1261 (emphasis in original).  The NOFA also requires out-of-state applicants to provide a

costly, independent and unqualified legal opinion, which imposes significant burdens on entities

proposing to serve as a PBCA in foreign states.  AR at 1265-69.

### 4.       The 2012 GAO Protests

On May 29, 2012, SHCC and several other PHAs[3] timely filed pre-award protests at

GAO challenging HUD's use of the NOFA.  Although SHCC timely filed its GAO protest prior

to the due date for applications, HUD refused to delay the application submission date until after

resolution of the GAO protest.  As a result, SHCC was forced to submit applications that

complied with the NOFA's restrictive provisions.  On August 15, 2012, GAO issued a decision

sustaining the protests.  AR at 2838-52.  GAO found that, "HUD is required to use a

procurement instrument that results in a contract in order to obtain the provision of contract

administration services by PHAs for the Project-Based Section 8 HAP contracts."  AR at 2851.

GAO also found that HUD's use of the NOFA was "unreasonable and in disregard of applicable

statutory guidance."  *Id.*  GAO recommended that HUD cancel the NOFA and procure the

solicited services through a procurement contract.  AR at 2852.

### 5.       HUD's Response to the GAO's Recommendations

On October 19, 2012, HUD reported to GAO, pursuant to 31 U.S.C. § 3554(b)(3), that it

was "continu[ing] to assess the legal and operational issues raised by [GAO's]

---

[3] These included: Assisted Housing Services Corporation (B-406738.1), North Tampa
Housing Development Corporation (B-406738.2), The Jefferson County Assisted Housing
Corporation (B-406738.3; B-406738.7), National Housing Compliance (B-406738.4), and CMS
Contract Management Services (B-406738.6).

recommendations." AR at 8. On December 4, 2012, however, HUD posted a notice on its

PBCA website stating that it "has decided to move forward with the 2012 PBCA NOFA and

plans to announce awards on December 14, 2012." AR at 9.

## IV. ARGUMENT

### A. HUD Must Obtain PBCA Contract Administration Services Through A Procurement Contract.

The Court has jurisdiction to hear this pre-award bid protest under the Tucker Act.

Section 1491(b)(1) of the Tucker Act provides in part:

> [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491(b)(1) (emphasis added). In its motion to dismiss, the Government fails to refute

Plaintiffs' argument that the NOFA is not a procurement subject to the Court's jurisdiction under

the Tucker Act. We demonstrate below that HUD's actions in structuring the PBCA Program

have resulted in procurement contracts, regardless of HUD's arguments related to Congress'

alleged intent in enacting the statutory scheme that authorizes HUD to provide assistance to low-

income residents. Moreover, HUD's arguments regarding its alleged statutory authority are not

dispositive in this case because HUD has elected to structure the ACCs in such a way that under

the governing "principal purpose" test of the FGCAA, the ACCs are underline(procurement contracts)

subject to federal procurement laws and regulations.

1.  **HUD's actions are inconsistent with the Government's assertion that HUD is statutorily prohibited from administering the HAP contracts.**

It is undisputed that the policy of the 1937 Act, as stated in its preamble, is to promote the general welfare of the nation by providing "financial assistance to the States and political subdivisions" of states to address the shortage of affordable housing for low-income families and to remedy unsafe housing conditions.  Pub. L. No. 75-412, 50 Stat. 888, 891 (1937).  The Government contorts this Preamble and declaration of policy, however, into a finding that the Act somehow reflects "Congress' intent to have state housing agencies be the primary recipients and facilitators for distributing Section 8 funds at the local level."  Govt. MTD at 9.  This leap in logic has no support in the statute or the record.

In fact, for all new construction and substantial rehabilitation housing projects, Congress clearly intended HUD to be the primary facilitator for the distribution of Section 8 funds to low-income families.  This is reflected in the 1974 amendments to the 1937 Act where, among other things, the Section 8 program was established.  Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974) (codified at 42 U.S.C. 1437f, § 8).  The 1974 Act directed HUD to provide assistance to low-income families as follows:

> (b)(1)  The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section.  In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

> (b)(2)  To the extent of annual contributions authorizations under section 5(c) of this Act, the Secretary is authorized to make assistance payments pursuant to contracts with owners or

> prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section.  The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

*Id.*

Clearly, Congress contemplated two different assistance structures.  For existing housing, HUD would provide the assistance payments to the PHA, which would then distribute the payments to the owners who agreed to provide housing for low-income families.  *Id.*  Conversely, for new construction or substantial rehabilitation projects, HUD would make assistance payments directly to the owners of the new or rehabilitated housing.  *Id.*  In this regard, HUD did exactly as instructed by Congress and entered into HAP contracts with owners or prospective owners of new construction or substantial rehabilitation.  AR at 2602 (In its Supplemental Agency Report to GAO, HUD stated that it "did, in fact, enter into and administer many of the HAP contracts for new construction and substantially rehabilitated projects.").

For over 20 years, HUD not only performed these HAP contracts authorized under subsection (b)(2) of Section 8, but also conducted the contract administration services that HUD now asserts Congress *always* intended for the PHAs to perform.  Govt. MTD at 9 ("Thus, Congress' intent to have state housing agencies be the primary recipients and facilitators for distributing Section 8 funds at the local level was evident from the outset.").   HUD's authority to enter into *new* HAP contracts for new construction or substantial rehabilitation projects under subsection (b)(2) was repealed in 1983.  Housing and Urban-Rural Recovery Act of 1983, Pub. L. 98-181, §209(a)(2), 97 Stat. 1153, 1183 (1983).  Its authority to continue performing and renew the existing contracts, however, was extended in 1997 through the enactment of the

Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") Pub. L. No.

105-65, Title V, § 524, 111 Stat. 1344 (1997).  It was not until 1999 when the PBCA Program

was created that HUD began to transfer the administration of these HAP contracts to PHAs.

      The Government attempts to sidestep the true impetus for the creation of the PBCA

Program simply stating that following regarding the repeal of subsection (b)(2) and the

enactment of MAHRA, "[a]ccordingly, in 1999, HUD held a nationwide competition to award an

ACC in each of the 50 states…, plus the District of Columbia and the Commonwealth of Puerto

Rico."  Govt. MTD at 15.  As the record amply demonstrates, however, the PBCA Program in

fact was created by HUD after it came under fire for numerous internal failures, billing

problems, and staffing issues related to HUD's administration of the HAP contracts.    AR at

242-249 (U.S. GAO, Testimony Before the Subcommittee on Housing Opportunity and

Community Development, et al., HUD Management: Information and Issues Concerning HUD's

Management Reform Efforts, May 7, 1998); AR at 251-254 (U.S. GAO, Testimony Before the

Subcommittee on Housing and Community Opportunity, et al., Comments on HUD's Fiscal

Year 2000 Budget Request, March 3, 1999).

      As a result of this strong criticism and significant staffing shortages, HUD elected to

outsource contract administration services to the PHAs through a competitive process, thus

creating the PBCA Program.  AR at 233 (U.S. GAO, Report to Congressional Committees,

Project-Based Rental Assistance: HUD Should Update Its Policies and Procedures to Keep Pace

with the Changing Housing Market, April 2007); AR at 259 (HUD 2000 Budget Summary,

Housing Certificate Fund).  GAO described the reasons HUD began to outsource these services

as follows:

> In 1999, because of **<u>staffing constraints</u>** (primarily in
> HUD's field offices) and the **<u>workload involved</u>** in

> reaching the end of their initial terms, HUD began an
> initiative to contract out the oversight and administration of
> most of its project-based contracts.

AR at 233 (April 2007 GAO Report to Congressional Committees) (emphasis added).  Prior to

the implementation of the program, HUD itself confirmed that it had "plan[ned] to procure the

services of contract administrators to assume many of these specific duties **in order to release**

**HUD staff** for those duties that only government can perform and to increase accountability for

subsidy payments."  AR at 259 (HUD 2000 Budget Summary, Housing Certificate Fund)

(emphasis added).  Thus, in 1999, HUD issued a Request for Proposals seeking sources interest

in providing contract administration services for the PBCA Program.  AR at 428-58 (1999

Request for Proposals).  The 1999 Request for Proposals stated that it was outsourcing the

administration of most of the HAP contracts that were then being administered by HUD as

follows:

> Of the approximately 24,200 project-based Section 8 HAP
> Contracts in effect, Public Housing Agencies (PHAs) currently
> administer approximately 4,200. These PHAs will generally
> continue to administer these HAP Contracts until expiration. HUD
> administers the balance of approximately 20,000. This RFP covers
> contract administration for most of these HUD administered
> contracts.

AR at 428 (1999 Request for Proposals).

Under the PBCA Program, HUD enters into an ACC with a PHA.  The ACC specifically

describes the contract administration services the PHA is required to perform.  Along with the

ACC, HUD assigns to the PHA a portfolio of HAP contracts that it will be required to administer

pursuant to the ACC.  By and large, these HAP contracts are either HAP contracts that were

authorized under the now repealed subsection (b)(2) or renewals of such HAP contracts.  AR at

2604 (Supp. Agency Report); *See* AR at 2255-62 (Sample Project-Based HAP Contract).  The

renewal HAP contracts require a box to be checked on the cover page indicating whether the renewal contract is being entered into pursuant to the authority to renew Section 8 contracts under MAHRA or under one of the exceptions of MAHRA.  *See* AR at 2264-82 (Sample Renewal HAP Contract).

HUD's continued self-administration of these HAP contracts for more than fifteen years following the repeal of subsection (b)(2) directly contradicts the Government's bald assertion that "HUD is statutorily precluded from administering HAP contracts unless there is no PHA able to do so."  Govt. MTD at 15.  Moreover, if Congress had intended that HUD not perform HAP contracts itself but only through PHAs, Congress would have so stated at some point between 1983 and 1999.  Although HUD no longer has the statutory authority to enter into *new* HAP contracts for new construction or substantial rehabilitation projects, the original authority vested in HUD under subsection (b)(2) has been extended by Congress through the use of MAHRA and the renewal contracts, and HUD's own actions demonstrate that it is authorized to administer the HAP contracts itself if it so chooses.

> **2.** **Regardless of whether HUD is statutorily required to use PHAs to administer the Section 8 HAP contracts, the vehicle HUD has chosen to use falls within the definition of a "procurement contract" under federal law.**

Assuming, *arguendo*, that as the Government argues, HUD allegedly is statutorily required to enter into an ACC with the PHAs to administer the HAP contracts under Section 8, the ACC cannot properly be defined as a cooperative agreement under federal law.  Once again, HUD's own actions belie the notion that the HUD is required to use a cooperative agreement for the contract administration services.  In this case, HUD has structured the ACCs used in the PBCA Program in such a way that under the principal purpose test of the FGCAA, the ACC falls

squarely within the definition of a "procurement contract," thus making the ACC subject to federal procurement laws and regulations.  31 U.S.C. § 6303.

For purposes of this argument, if following the repeal of subsection (b)(2), HUD actually believed it was required to follow the provisions of subsection (b)(1) and to utilize ACCs in order to provide assistance payments to the owners of housing projects, it is baffling why HUD did not simply use the same ACC structure that it already had in place for the tenant-based assistance that had always been provided under subsection (b)(1).  Under the tenant-based assistance program (which for purposes of the PBCA Program consists almost solely of the Tenant-Based Rental Assistance Program), HUD grants assistance to the PHAs through an ACC, and the PHAs then determine the assistance payments to be made to the recipients.

As a general matter under the tenant-based program, the PHAs largely have control over the management and performance of the HAP contract, including the discretion to select the recipients of the housing assistance payments.  In short, HUD has vested in the PHA the maximum amount of responsibility and flexibility in the administration of the Tenant-Based Rental Assistance Program.  *See* 42 U.S.C. § 1437f(a)(1)(C) (fulfilling the 1937 Act's declaration of policy).  At the other end of the spectrum, HUD has merely granted the PHAs a bare minimum of flexibility under the PBCA Program.  Thus, HUD's argument that it is simply following its own model is erroneous and cannot be used to support the argument that the under the FGCAA test, the principal purposes of these contract vehicles are identical.

An ACC is defined in HUD's regulations as "the written contract between HUD and a PHA under which HUD agrees to provide funding for a program under the 1937 Act, and the PHA agrees to comply with HUD requirements for the program."  24 C.F.R. § 5.403.  The pivotal inquiry here is whether HUD has structured the ACC in a manner that permits HUD to

properly characterize it as a "cooperative agreement" under federal law, thereby obviating the need for compliance with certain federal procurement laws and regulations. As demonstrated below, the answer in this case is "no."

This Court has stated that executive agencies must follow the criteria Congress prescribes in the FGCAA in selecting which instrument to use to establish a relationship between the agency and another party. *360Training.com, Inc. v. U.S.*, 104 Fed. Cl. 575, 579 (2012). Pursuant to the FGCAA, the difference between a cooperative agreement and a procurement contract turns on the "principal purpose" of the instrument. An executive agency must use a cooperative agreement when "the **principal purpose** of the relationship **is to transfer a thing of value** to the State, local government, or other recipient **to carry out a public purpose** of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6305 (emphasis added). Conversely, a procurement contract should be used when "**the principal purpose** of the instrument is **to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government**." 31 U.S.C. § 6303 (emphasis added).[4]

---

[4] The U.S. Government Accountability Office (GAO) provides a similar interpretation of the FGCAA in its Redbook:

> The Federal Grant and Cooperative Agreement Act's basic criterion on when to use a procurement contract rather than one of the two assistance agreement (a grant or cooperative agreement) is clear and turns on the underlying purpose of the agreement: If the federal agency's primary purpose is to acquire goods or services for the direct benefit or use of the government, then a procurement contract must be used. On the other hand, the act calls for the use of a grant or a cooperative agreement when the agency's primary purpose is to provide assistance for the recipient to use in order to accomplish a public objective authorized by law. Thus,

13

Where, as here, an agency intends to provide assistance to specified recipients by using an intermediary, this Court has noted that the principal purpose of the funding relationship may not always be clear. *360Training.com, Inc. v. U.S.*, 104 Fed. Cl. 575, 580 (2012). In this regard, the *360 Training* Court found that:

> An agency is acquiring the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide to beneficiaries the services offered by the intermediary. *Id.* In other words, if the agency uses an intermediary to provide a service that the agency is required to provide to beneficiaries, then the services are for the agency's benefit. However, an agency is obtaining services for a public purpose if the agency is charged with providing support or assistance to intermediaries as opposed to the final beneficiaries. When an agency supports those intermediaries in providing a service to third parties, an assistance agreement can be the appropriate instrument. *Id.* Thus, a key inquiry is whether the agency's focus is on providing a service to the ultimate beneficiaries or on assisting the intermediaries in providing a service.

*Id.* (citing GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. 2, Ch. 10 (3d ed. Feb. 2006). Another way to view the intermediary situation is to state, "[w]here the recipient of an award is not receiving assistance from the federal agency but is merely used to provide a service to another entity which is eligible for assistance, the proper instrument is a procurement contract." S. REP. NO. 97-180, at *5 (1981), 1982 U.S.C.C.A.N. 3; Pub. L. No. 97-162. This is the plainly the case here. The PHA is awarded the ACC, but does not receive assistance from HUD. Instead, the PHA provides the administration services for the HAP contract between HUD and the housing project owner, who is the party eligible to receive the federal assistance. The contract administration services provided by the PHAs directly benefit

---

procurement contracts differ from either grants or cooperative agreements in terms of their basic purpose.

GAO Office of General Counsel, Principals of Federal Appropriations Law (3d Ed. 2006) at 10-15.

HUD by alleviating the need for HUD to perform the primarily ministerial administration functions that accompany the provision of housing assistance to the property owners.  Thus, under the principal purpose test of the FGCAA, where the PHAs provide a "direct benefit" to the HUD and act merely as an intermediary to facilitate the process by which HUD provides assistance to eligible recipients, the services must be acquired through a procurement contract.

The Government erroneously posits that "if the Court were determine HUD's award of an ACC is a procurement, the Court will have to first conclude that HUD has the responsibility to administer the HAPs."  Govt. MTD at 37.  The Government cannot escape the principal purpose test by merely asserting that it is statutorily required to enter into the ACCs with the PHAs.  As discussed above and as GAO found, the principal purpose of the ACCs, *as HUD has chosen to structure them*, is to obtain contract administration services from the PHAs.  AR at 2849-50.  The PHAs merely act as a "conduit" for HUD to provide the housing assistance payments to the property owners.

 Despite the Government's attempts to draw attention away from the principal purpose of the ACCs, the true nature of these instruments emerges when comparing the proposed ACCs for the project-based PBCA program at issue here against the ACCs also authorized under Section 8, but for the tenant-based PBCA program (commonly referred to as the "Tenant-Based Rental Assistance Program").  In the Tenant-Based Rental Assistance Program, the PHA plays an essential role in providing assistance to the specified recipients.  Critically, the PHA determines which low-income tenants are eligible to receive the housing subsidy under the program, and establishes and enforces the PHA's own policies for the tenants (in accordance with HUD regulations).  24 C.F.R. §§ 982.54(a), 982.157, 982.201.  Moreover, once the PHA has awarded a rent payment voucher to a tenant, the PHA also determines whether a unit is eligible under the

program, inspects the unit to ensure that it meets Housing Quality Standards, approves the

landlord for participation in the program, and determines whether the rent amount is reasonable.

24 C.F.R. §§ 982.201, 982.305(a).  Ultimately, the PHA can terminate the owners and residents -

- without HUD's approval -- for failure to comply with HUD's regulations and the PHA's

policies.

In addition, under the Tenant-Based Rental Assistance Program, the HAP contracts are

entered into solely between the PHA and the tenant; HUD is not a party to the agreement.  AR at

2178-89 (Sample Tenant-Based Assistance HAP Contract).  In other words, the PHAs have an

incredibly active role and are vested with great discretion in the operation of the Tenant-Based

Rent Assistance Program.

Conversely, under the project-based PBCA Program, the PHAs have a much more

restricted role.  The PHA -- as the contract administrator -- has no involvement in the direction of

the use of housing subsidy funds.  HUD's budget dictates the funding of housing assistance

payments for property owners under this program, and how the owners use those payments is not

controlled by the PHA.  Additionally, the PHA has no power to establish any policies for the

program, but rather, must strictly comply in its contract administration tasks in accordance with

the policies implemented by HUD.  AR at 2191-2253 (HUD Project-Based Section 8 HAP

Contract Administration Monitoring and Evaluation Guide).  In fact, HUD controls almost every

aspect of the program, including, among others, the following notable areas:

- HUD establishes the budget, which sets forth how the payments will be distributed
  among owners, without any input from the PHA;

- HUD selects the recipient of the housing subsidy;

- HUD selects the landlord for the program;

- HUD selects the eligible properties for the program;

- HUD is the only party that has the authority to change a unit configuration of the HAP contract (i.e., the number and bedroom type of units that receive a subsidy); and

- HUD holds all enforcement rights against non-compliant participants of the program (although the PHA may recommend a default and termination of the housing subsidies to a particular recipient, only HUD alone can issue a formal default notice and terminate the contract, or abate the subsidy on the contract);

24 C.F.R. § 880.501 *et seq.*; *see also* AR at 1353-1417 (Performance-Based ACC). Indeed, under the project-based PBCA Program, the PHA only engages in routine contract administration activities. HUD retains the ultimate authority for the HAP contract.

Moreover, the Government's statement that the PHAs enter into HAP contracts with the project owners is entirely misleading. Govt. MTD at 6-7. The original HAP contracts that the PHAs administer under this program were signed by HUD in the 1970s and the 1980s. The PHAs administratively renew the HAP contracts under a basic form renewal contract drafted and required by HUD. AR at 2264-82 (Sample Basic Renewal Contract). Although the renewal contract defines the HAP contract to be between "the Contract Administrator and the Owner," the contract explicitly states that "HUD shall remain a party to the provisions of the Renewal Contract that specify HUD's role pursuant to the Renewal Contract." AR at 2270.

The Government's deliberate effort to make it appear as though the PHAs are performing work that somehow directly fulfills the greater mission of a PHA and the public housing program is not supported by the record and is contradicted by the true nature of the work as set forth in the NOFA. Even HUD's own handbook contradicts its position. In the HUD Handbook 4350.3,

entitled "Occupancy Requirements of Subsidized Multi-Family Housing Programs, HUD

describes the role of the project-based contract administrators as follows:

> Under a performance-based ACC, **the scope of responsibilities of a Contract Administrator is more limited than that of a Traditional Contract Administrator**.  A PBCA's responsibilities focus on the day-to-day monitoring and servicing of Section 8 HAP contracts.  PBCAs are generally required to administer contracts on a statewide basis and have strict performance and reporting requirements as outlined in their ACC.

AR 2285 (emphasis added).  In accordance with HUD's Handbook, the performance tasks

described in the proposed ACC are purely administrative in nature and prohibit the ACC from

acting without the discretion of HUD.[5]

Importantly, the ACC sets forth the mechanism by which HUD will transfer the housing

assistance payments to the PHA, who will then distribute it to the designated recipient.

Performance Based Task Number Three instructs the PHA to submit vouchers (which are given

to the PHA by the owners) to HUD by the tenth day of the month preceding the month for which

the owner is requesting payment.  AR at 1385.  A PHA may not pay an owner until a voucher is

received and reviewed to ensure the request is adequately supported by HUD systems data.  In

particular, the PHA reviews the voucher to verify that the owner has complied with HUD

---

[5] The proposed ACC to be awarded under the NOFA sets forth the following "Performance Based Tasks" (PBTs):

1. Management and Occupancy Reviews.
2. Adjust Contract Rents.
3. Review and Pay Monthly Vouchers.
4. Renew HAP Contracts and Process Terminations or Expirations.
5. Tenant Health, Safety, and Maintenance Issues.
6. Administration – Monthly and Quarterly Reports.
7. Administration – ACC Year End Reports and Certifications.
8. Annual Financial Reports – PHA FYE.

AR at 1374-1375.

regulations and requirements.  Once the Form HUD 50059 (Owner's Certification of
Compliance with HUD's Tenant Eligibility and Rent Procedures) has been approved, the PHA
notifies HUD.  Only then will HUD transfer the funds to the PHA for disbursement to the owner.
Notably, the PHA must transfer the housing assistance subsidies to the owner **within one
business day** of receiving the housing assistance payment from HUD.  *Id.*  Put a different way,
the PHA acts as the administrator of the housing assistance payments, exercises no discretion in
making such payments, and assists HUD in facilitating the payment to the owner on a mandatory
one-day turnaround.  This example firmly supports GAO's conclusion that the principal purpose
of the ACCs is to procure the services of the PHA to administer the contracts and act as a conduit
for the assistance payments.  *See* AR at 2838-52 (GAO Decision)

Nowhere in the ACC does HUD grant the PHA the authority to address the supply or
shortage of housing, directly or indirectly.  Thus, it simply strains the bounds of logic for the
Government to contend that the PHAs are providing these contract administration services to
directly fulfill "their overall mission of promoting affordable housing in their community."
Govt. MTD at 34.  In the manner HUD has elected to structure the ACCs, the true principal
purpose is not to grant assistance *to the PHA*, but to grant assistance *through the PHAs* to the
intended recipients -- the property owners.  As a result, the PHAs provide the contract
administration services under the PBCA Program for the direct benefit of HUD.  The record here
confirms that HUD has opted to construct the ACCs in a way that falls squarely within the
definition of a procurement contract.  Consequently, this Court has proper jurisdiction to render
judgment on this pre-award bid protest under the Tucker Act.

**B.      Even If The Court Finds That The NOFA Is A Cooperative Agreement, The Restrictions Contained In The NOFA Are Unreasonable.**

Even if for sake of argument the Court finds it was proper for HUD to use a cooperative agreement to procure the services at issue in this case, the Court clearly has jurisdiction under the Tucker Act to determine whether HUD's actions regarding the NOFA are proper. *360Training.Com v. United States*, 104 Fed. Cl. 575, 577-78 (2012). As described above, PHAs are not themselves authorized to receive assistance under the PBCA Program; HUD is using the PHAs to administer the PBCA program. *See supra* at 10-18. HUD's issuance of the NOFA is therefore a "procurement process" within the meaning of the Tucker Act, and this Court has the authority to consider the propriety of the NOFA.

Pursuant to the FGCAA, all grant and cooperative agreement programs involving discretionary recipients must provide for competition among the prospective recipients whenever possible. *See* 31 U.S.C. § 6301(3) ( the Act "promote[s] increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements, maximize[s] competition in making procurement contracts, ***and encourage[s] competition in making grants and cooperative agreements***.") (emphasis added).

The NOFA's restrictions on out-of-state PHAs unduly restrict and limit competition in a manner that is inconsistent with the FGCAA. With respect to out-of-state PHAs, the NOFA states:

> HUD will consider applications from out-of-State applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant. Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that state.

AR at 1261.  The NOFA also imposes additional burdens on those PHAs who desire to serve in

states other than their home states, including a requirement for the provision of a detailed legal

opinion.  AR at 1262.[6]   Such restrictions were not included in the 1999 RFP that created the

initial PBCA contracts.  *See generally* AR 428-58.  In fact, HUD previously took the position

that it wanted only the best value for its money and to obtain a high level of performance on the

PBCA contracts.

As justification for the newly-imposed restrictions on out-of-state applicants, the DOJ

references letters provided by State Attorneys General.  At the time the NOFA was issued, there

were only six such letters.  Now there are letters from nineteen states.  These letters do not

provide justification for the restrictions in the NOFA – and certainly provide no justification for

the extension of restrictions to states where no opinion has been proffered.  The imposition of

these restrictions as to all states lacks any reasonable basis and prejudices SHCC.

As an initial matter, it is not settled that HUD must defer to the states in making

eligibility determinations as concern PBCA contracts.  HUD explicitly acknowledges in the

---

[6] The NOFA includes this requirement concerning legal opinions:

> HUD requires that an out-of-State applicant establish not only that
> the law of the State under which it was created (e.g., State A)
> authorizes it to operate throughout the entire State in which it
> proposes to serve as PBCA (e.g., State B)but also that the law of
> such State (e.g. State B) does not prohibit such an arrangement.
> HUD also requires that each out-of-State applicant supplement its
> Reasoned Legal Opinion (RLO) (see definition below) with a
> Supplemental letter (see definition below) signed by an attorney
> authorized to practice law in the State for which it applies (e.g.,
> State B) certifying that nothing in the laws of such State in any
> manner prohibits the applicant, although formed under the laws of
> a sister State, from acting as a PHA in the State for which it is
> applying.

AR at 1262.  This provision puts an extremely onerous burden on out-of-state applicants.

NOFA that "nothing in the 1937 [Housing] Act prohibits an instrumentality PHA that is 'authorized to engage in or assist in the development or operation of public housing' within the meaning of section 3(b)(6)(A) of the 1937 Act from acting as a PHA in a foreign state."  AR 1261.  In addition, HUD is in privity of contract with the PHAs.  At best what is at issue is a conflict between state and federal law.  Principles of federal supremacy and pre-emption dictate that federal law trump state law in this situation.  *See, generally, Altria Group v. Good*, 555 U.S. 70 (2008).

Second, even if the State AG letters were to be given any deference, an examination of the letters themselves[7] indicate that the nineteen states that submitted letters did not unequivocally take the position that "out-of-state PHAs could not lawfully operate within their own state" as the Government claims.  Govt. MTD at 41.   For example, the letter from the California AG states:  "Although *there is no case or statute precisely on point*, our review of the relevant authorities leads us to conclude that a local housing authority *likely* lacks the necessary legal authority to operate statewide."[8]  The August 4, 2011 Connecticut AG letter says that "an instrumentality of an out of state public housing authority may not act as a public housing authority in Connecticut, *without first being authorized to do so according to Connecticut law*.").[9]  The Illinois AG letter includes this sentence:  "Although the State Housing Act and the Housing Authorities Act do not contemplate an out-of-state agency or instrumentality serving as a public housing agency in Illinois, it might be possible for such an entity to do so pursuant to the

---

[7] The letters are available at: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA.

[8] http://portal.hud.gov/hudportal/documents/huddoc?id=CAtoAG.pdf at 1 (emphasis added).

[9] http://portal.hud.gov/hudportal/documents/huddoc?id=CTtoAG.PDF at 1 (emphasis added).

provisions of the Intergovernmental Cooperation Act."[10]

Even more egregiously, the letter from the Arizona AG is not based upon state law, but upon that state's interpretation of HUD regulations.  ("This letter does not represent the formal or informal opinion of the Arizona Attorney General. . . . The Department believes that HUD's own codes, regulations and handbook do not permit giving a Section 8 PBCA contract to an out-of-state entity. . . .").[11]  The State of South Carolina goes one step further, concluding in its letter that "while we may offer an opinion as to the jurisdiction of housing authorities under State law, we believe that HUD is in a better position to decide whether or not a housing authority may be considered under the Invitation."[12]  As the South Carolina AG seemed to acknowledge, HUD cannot rely upon *state* attorney generals to interpret applicable *federal* statutes and implementing regulations.

Third, even if these AG letters did demonstrate that the NOFA's restrictions are appropriate in these nineteen states, the existence of these letters cannot justify the imposition of these same restrictions in the remaining twenty-three states under the NOFA.  HUD has absolutely no basis to believe that these restrictions are legally necessary in the remaining states, and has undertaken no analysis to make this determination.  It is per se unreasonable for HUD to impose a blanket restriction on competition in all NOFA states based on letters from a few states (six at the time the NOFA was issued).  Since the record is not sufficiently developed to say that the restriction of competition in all states is reasonable, the blanket imposition of this restriction is arbitrary, capricious, and unsupported by law.  Likewise, the requirement in the NOFA that

---

[10] http://portal.hud.gov/hudportal/documents/huddoc?id=ILtoAG.pdf at 1.  The Illinois Attorney General letter is also not a formal opinion.  *Id.* ("Because of the nature of your inquiry, I do not believe that issuance of an official opinion of the Attorney General is appropriate.").

[11] http://portal.hud.gov/hudportal/documents/huddoc?id=AZtoAG.PDF at 1.

[12] http://portal.hud.gov/hudportal/documents/huddoc?id=SCtoAG.PDF at 4.

requires out-of-state PHAs to obtain legal opinions, which is not required for in-state PHAs, lacks any rational basis.

SHCC is undeniably prejudiced by these improper restrictions.  SHCC is presently the incumbent contractor for the state of Arkansas, with an excellent performance record, yet it has lost the opportunity to compete in a fair and open competition in Arkansas.  HUD has no letter from the State of Arkansas that says SHCC, or any other out-of-state PHA, may not compete there.  The restrictions in the NOFA that prohibit SHCC from obtaining a cooperative agreement to administer the Arkansas contract, or any other out-of-state contract, lack reasonable basis and cannot be permitted to stand.

### C.   SHCC Is Entitled To Declaratory And Injunctive Relief.

This Court "may award any relief that [it] considers proper, including declaratory and injunctive relief" to correct a defective solicitation.  28 U.S.C. § 1491(b)(2).  To be entitled to permanent injunctive relief a plaintiff much demonstrate:  (1) success on the merits; (2) that it will suffer irreparable harm if injunctive relief is not granted; (3) that the benefit of the relief outweighs any harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12 (1987)).

As concerns success on the merits, we have demonstrated above that the PBCA services HUD seeks should be obtained through procurement contracts rather than cooperative agreements.  In the alternative, in the event the Court finds that PHA services may be obtained through a cooperative agreement, we have shown that the cooperative agreements contemplated here are unduly restrictive, in violation of the FGCAA.

SHCC will suffer irreparable harm if injunctive relief is not granted.  As an out-of-state

PHA in every state other than Texas, SHCC would be ineligible to compete in a majority of the other states by virtue of the NOFA's requirements, including in Arkansas, where it is the incumbent contractor.[13] If SHCC has no opportunity for award, SHCC is deprived of the opportunity to receive the profits from the performance of the contract. *Mangi Environmental Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19-20 (2000) (the loss of profit to be made on the contract constitutes irreparable injury). The only other available relief is the potential for recovery of bid preparation costs, which will not compensate SHCC for its loss of the valuable contract business. *See Bean Dredging Corp. v. United States,* 22 Cl. Ct. 519, 524 (1991) (finding bidder would be irreparably harmed because it could recover only bid preparation costs). The type of loss that is derived from the lost opportunity to compete on a level playing field for a contract has been found sufficient to prove irreparable harm. *Seattle Sec. Servs., Inc. v. United States,* 45 Fed. Cl. 560, 571-72 (1999).

Any inconvenience to HUD through the issuance of an injunction is outweighed by the demonstrated irreparably harm to SHCC if HUD proceeds with the award of contracts under the unlawful NOFA. Granting the injunction poses no risk of interruption of services to HUD, or to low-income housing residents, as the incumbent PBCA contracts have been extended for up to two years.

Finally, the Government's adherence to its procurement laws is in the public interest, as is full and open competition for PBCA contracts. *See Overstreet Elec. Co., Inc. v. United States,* 47 Fed. Cl. 728, 744 (2000) (the public's interest lies in preserving the integrity of the competitive bidding process).

---

[13] Under HUD's scheme, out-of-state PHAs will be ineligible for award in any state in which an in-state PHA has also applied, which is expected to be the "majority" of states. AR at 1261.

Accordingly, SHCC seeks a declaratory and injunctive relief stating that the NOFA is not the proper instrument to obtain PBCA services and directing HUD to obtain the services through full and open competition resulting in award of a procurement contract.  In the alternative, SHCC seeks a declaration that the NOFA is unduly restrictive and that, while a cooperative agreement may be the appropriate vehicle to obtain PHA services, HUD must revise the NOFA to remove the restrictions on out-of-state competition, and devise a competition for these cooperative agreements that only contains those restrictions reasonably necessary.

### D.   SHCC Is Entitled To Fees And Costs.

HUD's use of the NOFA has forced SHCC to expend a substantial sum to respond to the NOFA.  This Court has the authority to award bid and proposal costs pursuant to 28 U.S.C. § 1491(b)(2).  An award of bid and proposal costs is appropriate here, given the egregiousness of the Agency's position, particularly in light of the GAO's decision regarding this matter.

### V.   CONCLUSION

For the foregoing reasons, SHCC requests that this Court issue appropriate injunctive and declaratory relief and grant SHCC its costs in connection with this Protest.

DATED:  January 18, 2013

Respectfully submitted,

s/ Richard J. Vacura_____
Richard J. Vacura
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102
(703) 760-7764
(703) 760-7777 (fax)

*Counsel of Record for Plaintiff Southwest Housing Compliance Corporation*

Of Counsel:

Tina D. Reynolds
K. Alyse Latour
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102
(703) 760-7700