## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

———————————————————————

|  |  |  |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | No. 12-852C (and consolidated cases) |
| v. | ) ) | Judge Thomas C. Wheeler |
| THE UNITED STATES, | ) ) | |
| Defendant, and | ) ) ) | |
| MASSACHUSETTS HOUSING FINANCE AGENCY, | ) ) ) | |
| Intervenor | ) ) | |

———————————————————————

**BRIEF OF *AMICUS CURIAE* THE NATIONAL COUNCIL OF STATE HOUSING AGENCIES IN REPLY TO PLAINTIFFS' RESPONSES TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE AGENCY RECORD, AND PLAINTIFFS' CROSS-MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Kevin P. Mullen, Esq.
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Tel (202) 639-6024
Fax (202) 661-4827

Attorney of Record for *Amicus Curiae*
National Council of State Housing Agencies

Of Counsel:
Charles L. Capito, III, Esq.
JENNER & BLOCK, LLP

Dated:  January 30, 2013

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND...........................................................................1

II. SUMMARY OF THE ARGUMENT .................................................................................1

III. QUESTIONS PRESENTED ...............................................................................................3

    A. Do the Annual Contribution Contracts to Renew Section 8 Project-Based Housing Projects Constitute Assistance to State and Local Housing Agencies?..............................3

    B. Is the NOFA's Preference for In-State PHAs that Operate Lawfully on a Statewide Basis Reasonable?...............................................................................................3

IV. ARGUMENT......................................................................................................................3

    A. NCSHA Supports the Government's Motions in Full. .........................................................3

    B. HUD's Annual Contribution Contracts Provide Assistance to Housing Agencies in Furtherance of the Statutory Framework and the Housing Agencies' Missions. ...........4

        1. Distinguishing Cooperative Agreements from Procurement Contracts........................4

        2. The Purpose of the United States Housing Act of 1937 and the Renewal of the Section 8 Project-Based Housing Program Is to Assist the States in Providing Safe and Affordable Housing to Low-Income Families. ................................................6

        3. Public Housing Agencies, and Housing Finance Agencies In Particular, Play a Vital and Coextensive Role with HUD in the Administration of Project-Based Rental Assistance Programs........................................................................................8

        4. HUD Is Not a Party to the Renewed HAP Contracts...................................................11

    C. The NOFA's Preference for In-State PHAs that can Operate Legally on a Statewide Basis Is Reasonable.............................................................................................13

        1. Providing a Preference for In-State PHAs Is Necessary..............................................13

        2. The NOFA's Preference for Statewide PHAs Is Reasonable. ....................................15

V. CONCLUSION AND RELIEF REQUESTED .................................................................18

# TABLE OF AUTHORITIES

**CASES**

*360Training.com, Inc. v. United States*, 104 Fed. Cl. 575 (2012) ....................................................4

*Baker v. Cincinnati Metropolitan Housing Authority*, 675 F.2d 836 (6th Cir. 1982) ..................15

*Interpretation of Federal Grant and Cooperative Agreement Act of 1977*, B-196872-O.M., 1980 U.S. Comp. Gen. LEXIS 3894 (Mar. 12, 1980)......................................................5

*Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247 (2011) .......................................12

*Savorgnan v. United States*, 338 U.S. 491 (1950) ...........................................................................6

*Senate Manor Props., LLC. v. U.S. Dept. of Hous. & Urban Dev.*, 315 Fed. Appx. 235 (Fed. Cir. 2008) ...........................................................................................................12

*Thomas v. Washington Gas Light Co.*, 448 U.S. 261 (1980)..........................................................14

*Vandermark v. Housing Authority of the City of York*, 663 F.2d 436 (3d Cir. 1981).....................7

**STATUTES**

28 U.S.C. § 1491 ...............................................................................................................................5

31 U.S.C. § 6303(1) ..........................................................................................................................5

31 U.S.C. § 6305 ...............................................................................................................................4

42 U.S.C. § 1437(a)(1)(A) ................................................................................................................2

42 U.S.C. § 1437(a)(1)(B) ................................................................................................................2

42 U.S.C. § 1437(a)(1)(C) ................................................................................................................2

42 U.S.C. § 1440(b)(2)(A)...............................................................................................................17

Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 802(a), 88 Stat. 633, 42 U.S.C. § 1440............................................................................................16

Pub. L. No. 97-162, 96 Stat. 23 (1982).............................................................................................4

N.C. GEN. STAT. § 122A-5(1) ........................................................................................................14

**LEGISLATIVE MATERIALS**

H.R. REP. NO. 111-564 (2010) ........................................................................................8

S. REP. NO. 93-693 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4273 ...............................16

S. REP. NO. 97-180 (1981), *reprinted in* 1982 U.S.C.C.A.N. 3 .......................................4

S. REP. NO. 111-230 (2010) ..........................................................................................18

## I.     INTRODUCTION AND BACKGROUND

The National Council of State Housing Agencies ("NCSHA" or "Council") respectfully submits this brief as *amicus curiae* in these consolidated bid protests.  NCSHA is a non-profit, nonpartisan organization created by the nation's state Housing Finance Agencies ("HFAs").  Its members are the HFAs of every state, the District of Columbia, New York City, Puerto Rico, and the U.S. Virgin Islands, and over 300 affiliate members in the affordable housing field.  The Council's mission is to advance through advocacy and education the nation's state HFAs' efforts to provide affordable housing to those who need it.

The Council offers an important viewpoint not fully represented by the existing parties in this case.  Our members (*i.e.*, state HFAs) are mission-based, publicly accountable, nonprofit entities created under state law to promote and advance affordable housing in their states and communities.  They operate with statewide authority and qualify as Public Housing Authorities ("PHAs") for purposes of administering federal housing assistance funded by the U.S. Department of Housing and Urban Development ("HUD").  Most have operated for several decades and have a distinguished track record in successfully administering federal housing programs.  Although this brief supports the Government's Motion to Dismiss and its Motion for Judgment on the Administrative Record, the Council offers a perspective not advanced by any of the parties concerning the roles of PHAs and, in particular, HFAs, in furtherance of HUD's project-based rental assistance program.

## II.     SUMMARY OF THE ARGUMENT

Like Defendant, the Council understands HUD's purpose in administering the Federal Government's Section 8 Housing Program, as stated by Congress, is to "assist the States and political subdivisions of the State" to address and remedy shortages in safe and affordable

housing for low-income families.   42 U.S.C. § 1437(a)(1)(A)-(C).   Here, HUD's Notice of Funding Availability ("NOFA") furthers this principle statutory objective by providing assistance and cooperation to PHAs to administer Section 8's Project-Based Rental Assistance Program.   In addition, HUD's decision to establish a preference for in-state PHAs that can operate lawfully on a statewide basis is necessary because state housing laws preclude out-of-state PHAs from operating as a "public" agency within the state's borders.   The preference for PHAs that operate lawfully on a statewide basis also is reasonable because it is consistent with Congress's stated preference for state HFAs and is supported by important policy and administrative considerations.

Contrary to Plaintiffs' version of history, state and local PHAs always have played (and always will play) a vital and coextensive role in the administration of Section 8, including HUD's project-based rental assistance program.   At its core, Plaintiffs' argument can be summarized as follows:   Because HUD previously administered assistance directly to property owners through  Housing Assistance Payment ("HAP") contracts, the Agency's renewal of such public assistance through third-party PHAs using a different assistance instrument – *i.e.*, the Annual Contribution Contract ("ACC") – must take the form of a competitive procurement in accordance with the Competition in Contracting Act ("CICA") and other laws and regulations. Not only is this argument logically flawed, it is contrary to the plain language of HUD's enabling statute and legislative history, discounts HUD's considerable discretion, and disregards the fact that PHAs – and, in particular, state HFAs – play an inextricable and coextensive role in the provision of Section 8 assistance.

III.    **QUESTIONS PRESENTED**

    A.    Do the Annual Contribution Contracts to renew Section 8 Project-Based Housing Projects constitute assistance to state and local housing agencies?

    B.    Is the NOFA's preference for in-state PHAs that operate lawfully on a statewide basis reasonable?

IV.    **ARGUMENT**

    A.    **NCSHA Supports the Government's Motions in Full.**

The Council supports the Government's Motions in full.  As *amicus curiae*, NCSHA appreciates its role in this case and will not engage in a point-by-point rebuttal of all of Plaintiffs' legal and factual arguments.  The Government has established that:  (i) the Housing Act of 1937, as amended, provides the express statutory authority to HUD to enter into assistance agreements with PHAs; (ii) the NOFA concerning the performance-based ACCs in 40 states, plus the District of Columbia and the Commonwealth of Puerto Rico, contemplates the award of assistance agreements, rather than procurement contracts, as those terms are defined under the Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA"); and (iii) it was rational and reasonable to include a preference for in-state PHAs that can operate lawfully statewide.  The points that follow either supplement the Government's analysis from the Council's perspective or provide insight into the vital and coextensive role that PHAs – and in particular, HFAs – play in the administration of Section 8's Project-Based Rental Assistance program.

**B.**     **HUD's Annual Contribution Contracts Provide Assistance to Housing Agencies in Furtherance of the Statutory Framework and the Housing Agencies' Missions.**

**1.**     **Distinguishing Cooperative Agreements from Procurement Contracts.**

Under the FGCAA, an agency must use a cooperative agreement as the legal instrument reflecting a relationship between the Federal Government and an entity created under state or local law when:

> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient <u>to carry out a public purpose of support or stimulation authorized by a law of the United States</u> instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
>
> (2) <u>substantial involvement is expected between the executive agency and the State, local government, or other recipient</u> when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6305 (emphasis added).

According to this Court, "a key inquiry" in determining whether an agency should use an assistance agreement (*i.e.*, cooperative arrangement, in this case) or procurement contract "is whether the agency's focus is on providing a service to the ultimate beneficiaries or on assisting the intermediaries in providing a service."  *360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 580 (2012).  With respect to parties that are placed in between the Government and the ultimate beneficiary of the Government's public assistance – such as PHAs under the ACCs – the important question "is whether the federal government's principal purpose is to acquire the intermediary's services, which may happen to take the form of producing a product or carrying out a service that is then delivered to an assistance recipient, or if the government's principal purpose is <u>to assist the intermediary</u> to do the same thing."  S. Rep. No. 97-180, at 5 (1981); 1982 U.S.C.C.A.N. 3, 5; Pub. L. No. 97-162, 96 Stat. 23 (1982) (emphasis added).  Put another way,

"[t]he choice of instrument for an intermediary relationship depends solely on the <u>principal federal purpose</u> in the relationship with the intermediary."  S. REP. NO. 97-180, at 3 (emphasis added).

Conversely, the FGCAA prescribes that agencies "shall use a procurement contract" when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government."  31 U.S.C. § 6303(1).  For purposes of jurisdiction under the Tucker Act, 28 U.S.C. § 1491, a procurement contract is appropriate where "[a]n agency is acquiring the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide to beneficiaries the services offered by the intermediary."  *360 Training.com*, 104 Fed. Cl. at 580.

In this case, it is a not a close call as to whether HUD's characterization of the ACCs as cooperative agreements was legally appropriate.  The statute that authorizes and implements HUD's housing assistance programs is premised on, and organized around, HUD's provision of assistance to the states and their instrumentalities.  The ACCs effectuate the "principal purpose" of the Housing Act by providing assistance to PHAs so that they can accomplish a public purpose.  Rather than performing ministerial services solely for HUD's benefit, the PHAs work coextensively with HUD to ensure that the Federal assistance is distributed for the public good.

Even if it were a close call, however, guidance from the Government Accountability Office ("GAO") recognizes that: (i) the HUD is due a fair measure of discretion in determining the appropriate instrument; (ii) there is a tendency for agencies to use assistance agreements where the recipient, as in this case, is a state or local government (or instrumentality thereof); and (iii) the "considerable weight [given] to the administering agency's interpretation of its own authority."  *Interpretation of Federal Grant and Cooperative Agreement Act of 1977*, B-196872-

O.M., 1980 U.S. Comp. Gen. LEXIS 3894 *20-*21 (Mar 12, 1980).  Applying these factors to the circumstances of this case strongly favors deferring to HUD's choice to award the ACCs as cooperative agreements.  In short, HUD has administered ACCs for decades as assistance agreements (even if it did not label them as such); the recipients in this case are state agencies or quasi-governmental entities created under state law and are inexorable players in the statutory scheme; and, finally, HUD's interpretation of the text of the Housing Act was plainly reasonable and should be accorded considerable weight.

> **2.      The Purpose of the United States Housing Act of 1937 and the Renewal of the Section 8 Project-Based Housing Program Is to Assist the States in Providing Safe and Affordable Housing to Low-Income Families.**

In this case, the "principal federal purpose" is crystal clear and reflects the most basic form of Federal assistance to the states and their subsidiary entities.  *See Savorgnan v. United States*, 338 U.S. 491, 498 (1950) ("Acts are to be read in the light of the declaration of policy….").  Congress enacted the Section 8 Housing Program to effectuate the underlying purpose of the Housing Act of 1937, as amended, which is:

> (1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this chapter—
>
> (A)    ***to assist States and political subdivisions of States*** to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;
>
> (B)    ***to assist States and political subdivisions of States*** to address the shortage of housing affordable to low-income families; and
>
> (C)    consistent with the objectives of this subchapter, ***to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration***, with appropriate accountability to public housing residents, localities, and the general public;
>
> *            *            *

(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens **through the efforts and encouragement of Federal, State, and local governments**, and by the independent and collective actions of private citizens, organizations, and the private sector.

42 U.S.C. § 1437(a)(1)(A) & (B) (emphasis added); *see Vandermark v. Housing Authority of the City of York*, 663 F.2d 436, 441 (3d Cir. 1981) ("[T]he policy behind low-income housing is to delegate the maximum amount of authority to the local housing authorities.").

The Housing Act's repeated emphasis on assistance to the states belies Plaintiffs' argument that the ACCs are simple "fee-for-service" contracts.  It is indisputable that by issuing the NOFA for ACCs, HUD's "principal purpose" – its statutorily-mandated objective – is to provide <u>assistance</u> to the states.  *See* NOFA at 2 ("The purpose of HUD's PBCA program is to implement the policy of the United States, as established in section 2 of the United States Housing Act of 1937 . . . of assisting States and their political subdivisions in addressing the shortage of affordable housing and of vesting the maximum amount of responsibility and flexibility in program administration in PHAs that perform well.").  Thus, under the tests elucidated by Congress and by this Court in *360Training.com*, the ACCs awarded to effectuate Section 8 renewals are assistance agreements, and not procurement contracts.

With regard to the renewal of Section 8 project-based rental assistance in particular, the statutory framework plainly authorizes HUD to enter into ACCs with PHAs, and authorizes PHAs to renew or be assigned the rights and responsibilities for the HAP contracts with property owners.  More than authorizing, however, the statute indeed compels HUD to award the ACCs to PHAs unless the ACC is for an area where no PHA has been organized, as HUD reasonably interpreted before issuing the NOFA and as the Government has effectively argued in this case.  *See* Defendant Brief at 10-12, 31.  In that regard, if there were any questions about how Congress

intended HUD to use the $9.3 billion appropriated in Fiscal Year 2011 for the annual renewal of project-based assistance contracts, or the purpose for which Congress provided $315 million in the same year for the PHA contract administrators, those questions are definitively put to rest by the Housing Act's legislative history:

> As the Department rebids the contracts for performance-based contract administrators, the <u>Committee strongly believes that there should be a preference for public entities whose mission is oriented towards a public purpose</u>. In an increasingly tight fiscal environment, it is difficult to fund increases in programs, so these important federal funds should be used <u>to support the public mission of safe, affordable rental housing</u>.

H.R. REP. NO. 111-564, at 145 (2010) (emphasis added).  Thus, HUD's interpretation of the Housing Act's language requiring award to PHAs is both consistent with congressional intent and reasonable:  the renewed and rebid project-based assistance is to be administered by PHAs with the assistance and oversight of HUD.

>    **3.    Public Housing Agencies, and Housing Finance Agencies In Particular, Play a Vital and Coextensive Role with HUD in the Administration of Project-Based Rental Assistance Programs.**

Critical to Plaintiffs' characterization of the ACCs as procurement contracts are the related propositions that:  HFAs and other PHAs act as mere conduits for HUD; and HUD does not provide the requisite "assistance" to HFAs and other PHAs.  *See, e.g.*, CMS Brief (Docket No. 24, filed Jan. 18, 2013) at 21; SHCC Brief (Docket No. 26, filed Jan. 18, 2013) at 15-19; NHC Brief (Docket No. 28, filed Jan. 18, 2013) at 47-51.  Contrary to Plaintiffs' arguments, HFAs and other PHAs that perform under ACCs play a critical and cooperative role with HUD in administering project-based Section 8 assistance.

In their briefs, Plaintiffs paint a flawed picture of PHAs as little more than escrow agents that simply forward payment to property owners upon receipt of the right paperwork from the owner, in exchange for a fee from HUD.  In reality, PHAs are mission-based entities created

under state or local law and held publicly accountable to promote affordable housing in their states and communities.  The assistance that they provide is vital to the public safety, health, economy, education, and general well-being of the communities they serve.  HFAs, in particular, have been administering Federal and state housing assistance programs for decades.  The administration, oversight, and management of Section 8 housing programs are integral parts of their missions.  HFAs have a deep understanding of their constituent housing markets and needs. They have knowledge of and relationships with property owners and managers within their states and localities.  Consistent with congressional intent, HUD relies on this knowledge and its relationships with state HFAs to implement the fundamental statutory objective to assist the states in providing safe and affordable housing for low-income families.  Without this federal-to-state relationship, the federal housing plan would be less effective and could result in fraud, waste, and abuse.

In hopes of convincing the Court to treat these ACCs differently than ACCs that HUD has awarded for nearly three decades, Plaintiffs try to distinguish the project-based ACCs at issue in this case from HUD's other ACCs, such as the assistance agreements for the tenant-based rental assistance program.  *See, e.g.*, SHCC Brief at 15-16 ("In other words, the PHAs have an incredibly active role and are vested with great discretion in the operation of the Tenant-Based Rent Assistance Program.").  By making this argument, however, Plaintiffs implicitly acknowledge that HUD's other ACCs take the form of traditional assistance agreements. Although Plaintiffs assert that the renewal of performance-based ACCs at issue in this case are different than HUD's other ACCs, Plaintiffs provide no legal basis for distinguishing this same type of agency instrument.  *See id.*; *see also* CMS Brief at 21.

More importantly, however, Plaintiffs have understated the tasks and objectives of the performance-based ACCs for project-based rental assistance.  The ACCs provide vital assistance to state and local PHAs.  An important aspect of the federal assistance provided by HUD in furtherance of the PHAs' public purpose is the ability of the PHAs to enter into HAP contracts directly with property owners.  By conferring this authority upon PHAs and assigning HUD's existing contractual rights and responsibilities under existing HAP contracts to PHAs, HUD assists the PHAs in accomplishing the key statutory objectives – *i.e.*, to assist states to provide housing to low-income families.  Essential to the PHAs is the monetary assistance (both the payments and administrative fee) that HUD provides PHAs under the ACCs.  The ability to administer and effectuate payment of public monies for the public good is an inherently governmental function, and is not something that lends itself to a traditional procurement contract.

In addition, the ACCs require that PHAs, *inter alia*:  process and review monthly vouchers and special claims, review tenant files, conduct monthly and annual property and unit inspections, process rent adjustments, verify owners' compliance with HUD regulations and requirements, and compile periodic reports, requisitions, budgets and other financial documents.  These responsibilities are all necessary in order to effectuate the statutory goals of the Housing Act.  Although the tasks may seem ministerial to Plaintiffs, these functions involve active judgments and affect the eligibility of project owners, and ensure that owners are appropriately paid.

Importantly, many of the ACC's tasks relate directly to the PHAs' missions.  For example, the PHA is required to "[r]esolve tenant issues and establish positive relations and communications with residents of the community," ACC ¶ 3.5 (PBT #5) at 36, and to "identify

and resolve areas of noncompliance with HUD regulations and requirements." *Id.* ¶ 3.1 (PBT #1) at 24.   As explained above, critical to the success of any PHA is its familiarity with constituent projects and the importance of its relationships within the community.   The ACC furthers these important assistance objectives.

Finally, far from a basic "fee-for-service" contract, the ACC requires frequent and in-depth coordination and cooperation between HUD and the PHA in the preparation of monthly and quarterly reports, for example.   *See* ACC ¶ 3.6 (PBT#6) at 37-42 (requiring exchange and analysis of data concerning, *inter alia*, HAP contracts, covered units, management and occupancy, and inspections).   HUD's substantial involvement in the performance of the ACC makes its characterization as a cooperative agreement appropriate under the FGCAA.   *See* 31 U.S.C. § 6305.

### 4.   HUD Is Not a Party to the Renewed HAP Contracts.

At least three Plaintiffs argue that HUD remains a party to the HAP contracts, even though the renewed HAP contracts themselves specify the parties as the owner and the PHA (*i.e.*, the contract administrator).   *See* CMS Brief at 11-14, 17-18; NHC Brief at 47-51; Jefferson County Brief (Docket No. 30, filed Jan. 18, 2013) at 20-22.   These Plaintiffs argue that because HUD remains a party to the HAP contracts, the primary purpose of the ACCs is for HUD to procure the services of the PHA as basic contract administrators.   *See* Jefferson County Brief at 22.   The Government has adequately addressed this issue from a statutory and contractual standpoint.   However, also pertinent to this discussion is the long line of cases holding that HUD is <u>not</u> party to HAP contracts between PHAs and property owners, including renewal agreements where HUD has previously been a party to an earlier HAP contract.

In *Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247 (2011), the plaintiff was the owner of a property that participated in HUD's low-income rental assistance programs.

HUD and the plaintiff executed a HAP contract in 1992.  In 2004, Normandy entered into a "HAP Basic Renewal Contract" which, rather than HUD, listed an Oklahoma PHA as the contract administrator.  In 2007, HUD notified the plaintiff that HUD was terminating its Section 8 HAP payments.  The plaintiff subsequently sued HUD in the Court of Federal Claims alleging breach of contract.  The government moved to dismiss for lack of privity, pointing out that HUD was neither a named party nor a signatory to the HAP contract.  In response, the plaintiff argued that because the HAP contract was a renewal of an earlier HAP contract under which HUD was a party, and because HAP retained certain authority over the HAP contract, the court should have viewed it as a party to the renewed contract.  100 Fed. Cl. at 255.  The court rejected the plaintiff's argument as a "*non sequitor*" because the renewed HAP contract "plainly treats [the PHA], and not HUD as the contract administrator."  *Id.* (citing *Senate Manor Props., L.L.C. v. U.S. Dept. of Hous. & Urban Dev.*, 315 Fed. Appx. 235 (Fed. Cir. 2008) (rejecting reliance on this same "renewal" theory)).

The plaintiff also argued that the PHA signed the contract as an agent of HUD, and, thus, the plaintiff asserted that it had a contractual relationship with the government.  *Normandy Apts.*, 100 Fed. Cl. at 256.  In rejecting this argument, the court cited and quoted relevant precedent from the Court of Appeals for the Federal Circuit and its predecessor court, and concluded that:

> Cases examining this schema have repeatedly held that it does not give rise to an agency arrangement – that "[a] grant of benefits and subsequent oversight by HUD is insufficient to establish a contractual obligation between [a developer] and the government." *Katz*, 16 F.3d at 1210. This is true even if the "the Federal Government has intimate control over a project, including prior approval of plans and costs," *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982), and, conversely, the state agency " 'is acting merely as a conduit for the federal funds.'" *Katz,* 16 F.3d at 1210 (quoting *Marshall N. Dana Constr.*, 229 Ct. Cl. at 864)….

*Normandy Apts.*, 100 Fed. Cl. at 256 (emphasis added).  Thus, even in the context of a renewed HAP contract, this Court has held that HUD is not a party, notwithstanding the agency's prevalent role in the relationship between PHA and owner.

### C.    The NOFA's Preference for In-State PHAs that can Operate Legally on a Statewide Basis Is Reasonable.

The competition requirements of CICA do not apply in cases where, as here, the agency is awarding assistance agreements, rather than procurement contracts.  Even assuming, *arguendo*, that the Tucker Act, 28 U.S.C. § 1491, provides the Court with jurisdiction over these protests, HUD's determination to provide a preference for in-state PHAs that can operate legally on a statewide basis is eminently reasonable.  In fact, as a practical matter, such preferences are necessary under these circumstances.

### 1.    Providing a Preference for In-State PHAs Is Necessary.

As creatures of state law, PHAs cannot purport to operate out of the state in which they were created; nor can the authority vested by one state to act as a "public" or "quasi-governmental" housing agency transfer *ipse dixit* to another state.  This principle is akin to the well-established rule that an entity licensed to conduct business in its home state does not give it the right to operate in a sister state without first obtaining the requisite license from the sister state.  Each state, acting as an independent sovereign, implements policies and procedures necessary to qualify as a PHA within the boundaries of that state.  It is not enough to say that the standards of State A are stricter than the standards of State B, and that, therefore, a PHA from State A may administer federal and state housing assistance in State B.  To operate otherwise would "vest the power of determining the extraterritorial effect of a State's own laws and judgments in the State itself [and] risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the Full Faith and Credit Clause and other provisions of

Art. IV of the Constitution to prevent." *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 271 (1980).

As is evident from the numerous opinions from the states' attorneys general, this is not an academic or theoretical problem facing HUD.  It is real, and it presented a potentially significant stumbling block for efficient administration of HUD's project-based rental assistance programs. For example, state law commonly limits a local housing authority's jurisdiction to a particular geographic area within that state.  *See* Letter from North Carolina Attorney General to North Carolina Housing Finance Agency, Jun. 2, 2012, at 4-5 (citing N.C. GEN. STAT. § 122A-5(1)).[1] The effects of these laws are two-fold.  Not only do they prohibit in-state PHAs from operating outside of their jurisdiction, which would, of course, include another state, they also preclude a foreign state's PHA from operating within any jurisdiction in that state because it is has not been licensed under state or local law.  *See*  Letter from Pennsylvania Attorney General  to HUD, Apr. 19, 2012, at 2 ("After a thorough examination of the [state] Housing Finance Law, the Housing Act and the Housing Authorities Law, we have concluded that a local authority's jurisdiction is limited to its field of operation."); Letter from Illinois Attorney General to Illinois Housing Development Authority, Jun. 11, 2012 ("Neither the State Housing Act nor the Housing Authorities Act authorizes out-of-state agencies or instrumentalities to act as housing corporations or housing authorities in Illinois.").

In order to avoid the numerous and potentially disruptive conflicts with state housing laws,[2] HUD took the prudent, well-reasoned, and necessary step of incorporating into the NOFA

---

[1] All of the letters received by HUD from states' attorneys general are available at: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA

[2] *Baker v. Cincinnati Metro. Housing Auth.*, 675 F.2d 836, 839 (6th Cir. 1982) (acknowledging that "[i]t is the policy of the United States . . . to vest in <u>local</u> public housing agencies the maximum amount of responsibility in the administration of their housing programs).  For this

a preference for in-state PHAs.    Plaintiffs' complaints concerning the restrictions on

competitions are unavailing and pale in comparison to the statutory and programmatic interests

HUD has in implementing its federal housing policies designed "to assist the States" in a manner

that is harmonious with the state law.

### 2. The NOFA's Preference for Statewide PHAs Is Reasonable.

#### a. The NOFA's Preference for Statewide PHAs Is Consistent with Legislative Preferences for State HFAs.

State HFAs understand the unique community housing needs and markets throughout

their states.  They leverage and coordinate other federal and state resources under their control,

such as tax-exempt bonds, HOME Investment Partnerships program funds ("HOME"), and the

Low Income Housing Tax Credit, to address the physical and financial problems of these

properties.  The advantages and unique capabilities that state HFAs offer to HUD have not gone

unnoticed by Congress in the development of HUD's legislative landscape.  Indeed, Congress

expressed a preference for state HFAs in the 1974 legislation establishing HUD's Section 8

housing assistance program:

> To encourage the formation and effective operation of state
> housing finance agencies and state development agencies which
> have authority to finance, to assist in carrying out, or to carry our
> activities designed to . . . provide housing and related facilities
> though . . . construction, or rehabilitation….

Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 802(a), 88 Stat. 633,

42 U.S.C. § 1440.

---

reason, among many others, any argument that HUD should rely on the Supremacy Clause to
compel states to accept out-of-state PHAs is inconsistent with underlying federal policy.  In
addition to interfering needlessly in the states' efficient administration and oversight of its
housing laws, such a drastic measure by HUD would violate the basic policy objective of the
Housing Act – to assist the states in providing safe and affordable housing for low-income
families – as opposed to dictating to the states that methods for doing so.

Distinct from local PHAs, the statute defines "state housing finance agencies" as "any public body or agency, publicly sponsored corporation, or instrumentality of one or more States which is designated by the Governor."  42 U.S.C. § 1440(b)(2)(A) (emphasis added).  Thus, concurrent with the establishment of HUD's Section 8 housing programs, Congress established a clear preference for state HFAs.  In this regard, the Senate Report accompanying the 1974 legislation noted that:

> [T]he Committee has been cognizant of the increasingly important and effective role that State housing finance agencies have come to play in the field of government-assisted housing, and of the growing number of States that within the past few years have assumed this kind of responsibility for dealing with housing needs within their States. . . .  The Committee welcomes and encourages this approach, which combines the use of State resources, through State financing of housing and other measures such as tax abatement, with Federal housing assistance for low-and moderate-income housing.

S. REP. NO. 93-693, 1974 U.S.C.C.A.N. 4273, 4309 (1974); *see also id.* at 4314 ("[T]he Committee acknowledges and supports the growing role of state housing finance agencies in providing housing to low income families.  The Committee expects these agencies to function as public housing agencies in the administration of assistance under this Section [dealing with Section 8's leased housing assistance program].").

In recent appropriations, Congress has expressed preferences for HUD utilization of state HFAs in a number of related areas.  For example:

- The Senate Committee Report accompanying FY 2011 Transportation and HUD Appropriations noted that "[t]he Committee recommends the use of State housing finance agencies for REAC, where appropriate" for inspection activities related to HUD's Real Estate Assessment Center.  SEN. REP. No. 111-230 at 166.

- In urging HUD to work to limit or eliminate mortgage rescue scams, the Senate Appropriations Committee "advises that State housing finance agencies have a unique perspective on State and local housing issues, where such experience may be valuable in limiting and eliminating mortgage rescue scams."  *Id.* at 176.

The NOFA's preference for PHAs that can operate statewide, which would include state HFAs, is thus consistent with Congress's clearly established preference for state HFAs.

> **b.** **State HFAs Further the Statutory Purpose to Assist States in Providing Affordable Housing for Low-Income Families.**

HFAs reinvest excess income from HUD's Section 8 housing assistance programs back into affordable housing programs in their states.  In most cases, the HFA makes investments in, or for the benefit of, local low- and moderate-income communities.  Not only is this a boon to local housing, but it also leads to job growth in related or ancillary areas, including construction, property management, maintenance and repair services, brokerage services, and more.  In addition, state HFAs can leverage and coordinate other federal and state resources under their control, such as tax-exempt bonds, HOME, and the Low Income Housing Tax Credit, to address the physical and financial problems of these properties.  In many instances, out-of-state PHAs or non-statewide PHAs do not have the resources, (such as tax exempt bonds, tax credits and state financing) to work directly with owners to address the physical, functional or financial needs of the properties or to increase the affordable housing stock to meet housing needs within the entire state.

Local PHAs do not share the same comprehensive knowledge and understanding of statewide housing portfolios and markets.  They do not regularly come into contact with the properties, tenants, and other stakeholders as state HFAs do.   Also, fees earned by the out-of-state entities are taken out of the state in which they are generated, rather than being retained in the state to address critical housing needs.  Thus, rather than "assisting" the states identified by HUD as warranting assistance, out-of-state PHAs redirect portions of the federal monies for other uses in other states.  Unlike out-of-state PHAs, statewide HFAs, acting as the contract administrators, redirect the net revenue they earn to other affordable housing activities within the

state, including affordable housing preservation, homeless assistance, and first-time homebuyer help, further advancing the affordable housing mission they share with HUD.

## V.       CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons and the reasons set forth in the Government's pleadings, the Court should find that the project-based ACCs are assistance agreements that may be awarded outside the strictures of CICA-based competitions consistent with HUD's well-established practice.  The Court should also find that the NOFA's preferences for in-state PHAs that can operate lawfully on a statewide basis are necessary and reasonable measures.  Accordingly, the consolidated protests should be dismissed, or judgment should be granted in favor of the Government based on the administrative record.

Respectfully submitted,


/s/Kevin P. Mullen
Kevin P. Mullen, Esq.
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Tel (202) 639-6024
Fax (202) 661-4827

Attorney of Record for *Amicus Curiae*
National Council of State Housing Agencies

Of Counsel:
Charles L. Capito, III, Esq.
JENNER & BLOCK, LLP

Dated:  January 30, 2013