# In the United States Court of Federal Claims

Nos. 12-852C, 12-853C, 12-862C, 12-864C, & 12-869C

(Filed: April 19, 2013)

*************************************  *
CMS CONTRACT MANAGEMENT            *
SERVICES; THE HOUSING AUTHORITY    *
OF THE CITY OF BREMERTON;          *
NATIONAL HOUSING COMPLIANCE;       *
ASSISTED HOUSING SERVICES CORP.;   *
NORTH TAMPA HOUSING               * Pre-award Bid Protests; Project-
DEVELOPMENT CORP.; CALIFORNIA     * based HUD Section 8 Housing
AFFORDABLE HOUSING INITIATIVES,   * Assistance Program; Procurement
INC.; NAVIGATE AFFORDABLE         * Contracts       Contrasted      With
HOUSING PARTNERS; SOUTHWEST       * Cooperative Agreements; 31 U.S.C.
HOUSING COMPLIANCE CORP.; and     * §§ 6301 - 6308; Applicability of
MASSACHUSETTS HOUSING FINANCE     * Competition in Contracting Act and
AGENCY,                           * Federal    Acquisition    Regulation;
                                  * Analysis    of    HUD    Housing
                  Plaintiffs,     * Assistance Statutes and Regulations.
                                  *
v.                                *
                                  *
THE UNITES STATES,                *
                                  *
                  Defendant.      *
                                  *
*************************************

*Colm P. Nelson*, Foster Pepper PLLC, Seattle, Washington, for CMS Contract Management Services and the Housing Authority of the City of Bremerton.

*Neil H. O'Donnell*, with whom were *Dennis J. Callahan* and *Jeffrey M. Chiow*, Rogers Joseph O'Donnell, San Francisco, California, for Assisted Housing Services Corp., North Tampa Housing Development Corp., and California Affordable Housing Initiatives, Inc.

*Richard J. Vacura*, with whom were *Tina D. Reynolds* and *K. Alyse Latour*, Morrison & Foerster LLP, Washington, D.C., for Southwest Housing Compliance Corporation.

*Robert K. Tompkins*, with whom was *Elizabeth M. Gill*, Patton Boggs LLP, Washington, D.C., for Navigate Affordable Housing Partners.[1]

*Michael R. Golden*, with whom were *Michael A. Hordell*, *Heather Kilgore Weiner*, and *Samuel Jack*, Pepper Hamilton LLP, Washington, D.C., for National Housing Compliance.

*Gabe E. Kennon*, with whom was *Andrew Mohr*, Cohen Mohr LLP, Washington D.C., for Massachusetts Housing Finance Agency.

*Douglas K. Mickle*, with whom were *Joseph A. Pixley*, *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk Manhardt*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C.; *Dorie Finnerman*, Assistant General Counsel for Assisted Housing and Civil Rights, *Kathie Soroka*, Special Assistant to the General Counsel, and *Kasey M. Podzius*, U.S. Department of Housing and Urban Development, Washington, D.C., for Defendant.

*Kevin P. Mullen*, with whom was *Charles L. Capito III*, Jenner & Block LLP, Washington, D.C., for *amicus curiae* National Council of State Housing Authorities.

OPINION AND ORDER

WHEELER, Judge.

This consolidated bid protest involves five substantially equivalent suits challenging a 2012 Notice of Funding Availability ("NOFA") issued by the U.S. Department of Housing and Urban Development ("HUD"). The purpose of the NOFA is to fund HUD's Performance-Based Contract Administrator ("PBCA") Program for the administration of Project-Based Section 8 Housing Assistance Payment Contracts. HUD plans to award 53 state-wide contracts to Public Housing Authorities ("PHAs") for the oversight and administration of certain housing subsidy contracts with the private owners of multifamily housing projects. Plaintiffs are Public Housing Authorities and their non-profit subsidiaries and they allege that certain terms of the NOFA, in particular a preference given to in-state applicants, are in violation of the Competition in Contracting Act and the Federal Acquisition Regulation. The Government voluntarily has refrained from awarding the contracts pending the issuance of the Court's decision in this protest.

---

[1] When it entered this litigation, Navigate Affordable Housing Partners was known as Jefferson County Assisted Housing Corporation.

HUD does not dispute that the NOFA fails to meet the competitive requirements mandated by federal procurement laws and regulations.  Instead, it argues that these requirements are inapplicable to the contracts it plans to award under the NOFA because they are not "procurement" contracts at all, but rather are assistance agreements outside the domain of procurement law.  Based on this position, the Government moves to dismiss Plaintiffs' claims for lack of subject matter jurisdiction and, in the alternative, for judgment on the administrative record.  The Plaintiffs oppose both of these motions and cross-move for judgment on the administrative record.

Reaching a decision in this matter has required the Court's review of a morass of arcane housing assistance statutes and regulations.  After performing this review, and for the reasons explained below, the Court finds that the Government is entitled to judgment on the administrative record because the contracts in question are properly classified as cooperative agreements, not procurement contracts.

Background

In 1974, Congress amended the Housing Act of 1937 ("1937 Act" or "1937 Housing Act") to create what is known as the Section 8 Housing Program ("Section 8 Program").  See 42 U.S.C. § 1437f et seq; Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974).  Created "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing," 42 U.S.C. § 1437f(a), the Section 8 Program provides federally-subsidized housing to millions of low-income families and individuals through a range of rental assistance programs, both tenant- and project-based.  Under all types of Section 8 programs, tenants make rental payments based upon their income and ability to pay, and HUD then provides, under various delivery mechanisms, "assistance payments" to private landlords to make up the difference between the tenant's contribution and the agreed-upon "contract rent." 42 U.S.C. § 1437f et seq.; see also, e.g., Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1152 (9th Cir. 2011) (describing the program); Park Props. Assocs., L.P. v. United States, 82 Fed. Cl. 162, 164 (2008) (same).

The tenant-based Section 8 program, which is perhaps the better known of the two types of assistance, involves HUD's provision of a limited number of "Housing Choice Vouchers" to local PHAs throughout the country.  The PHAs distribute the vouchers to eligible low-income individuals and families who may use the vouchers to help them obtain eligible private-market rental units of their choice,[2] within certain cost parameters.  Generally, these vouchers are portable, in that the tenant may carry the benefit of the

---

[2] Eligible units are those that meet HUD-established standards for decent, safe, and sanitary housing and that are owned by a landlord willing to accept the voucher.  See 42 U.S.C. § 1437f(f)(7) and (o); 24 C.F.R. § 982.1(b)(1).

voucher to a new rental unit should he or she decide to move.  24 C.F.R. Part 982; see also, e.g., Graoch Assocs. #33, L.P. v. Louisville / Jefferson Cnty. Metro Human Relations Comm'n, 508 F.3d 366, 380 (6th Cir. 2007) (Merritt, J. concurring) (explaining operation of tenant-based program); Langlois v. Abington Hous. Auth., 207 F.3d 43, 45 (2d Cir. 2000) (same).

The dispute in this case involves the second, lesser-known type of Section 8 assistance, which is project-based.  Like the voucher holders, beneficiaries of project-based Section 8 programs[3] make income-based rental payments, with the difference between that payment and the contract rent made up by the program.  However, as the name of this program suggests, project-based rental assistance is attached to specific units or buildings owned by private-sector landlords.  Thus, project-based assistance is not portable, and when a tenant vacates a subsidized unit, the benefit becomes available to the unit's next occupant.  See 42 U.S.C. § 1437f(f)(6).

The Section 8 Program has undergone many statutory revisions since its enactment in 1974, and a close examination of the revisions, as well as HUD's responses to the same, is necessary to the resolution of the issues now before this Court.  Accordingly, the Court will outline the most significant portions of this statutory and program history below.

---

[3] HUD asserts, and Plaintiffs do not contest, that there are seven separate project-based Section 8 programs directly at issue in this bid protest: (1) the Housing Assistance Payments ("HAPs") Program for New Construction (24 C.F.R. Part 880); (2) the HAPs Program for Substantial Rehabilitation (24 C.F.R. Part 881); (3) the HAPs Program for State Housing Agencies (24 C.F.R. Part 883); (4) the HAPs Program for New Construction Set-Aside for Section 515 Rural Rental Housing Projects (24 C.F.R. Part 884); (5) the Loan Management Set-Aside Program (24 C.F.R. Part 886 Subpart A); (6) the Housing Assistance Program for the Disposition of HUD-Owned Projects (24 C.F.R. Part 886 Subpart C); and (7) the HAPs Program for Section 202 Projects (24 C.F.R. Part 891).  See HUD Mem. at 5 n.4.

In addition, HUD asserts, and Plaintiffs do not contest, that two other project-based Section 8 programs, while not directly at issue in this case, bear the potential to be affected by its outcome: the Moderate Rehabilitation Program (24 C.F.R. Part 882 Subparts A – G); and the Moderate Rehabilitation Single Room Occupancy Program for Homeless Individuals (24 C.F.R. Part 882 Subpart H).  These programs are administered by HUD's Office of Public and Indian Housing and Office of Community Planning and Development, respectively.  See HUD Mem. at 5 n.4.

In the interest of simplicity, however, the Court will refer throughout this opinion to all of these programs collectively, and in the singular, as the "project-based Section 8 program."

I.      The Pertinent Statutes

        A. The Housing and Community Development Act of 1974

        As noted above, the Section 8 Program first came into being with the enactment of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974) ("1974 Housing Act" or "1974 Act"), which amended certain provisions of the 1937 Housing Act.  At the time it was enacted, and as relevant to this case, Section 8, subsection (a) of this Act provided that "[rental] assistance payments may be made with respect to" three categories of housing: "[(1)] existing, [(2)] newly constructed, and  [(3)] substantially rehabilitated housing."  88 Stat. 662-63, codified at 42 U.S.C. § 1437f(a)(1).   Section 8, subsection (b), in turn, distinguished the proper administration of the program according to the type of housing in question, as follows:

(1) The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of *existing* dwelling units in accordance with this section.  In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

(2) To the extent of annual contributions authorizations under section 5(c) of this Act, the Secretary is authorized to make assistance payments pursuant to contracts with *owners or prospective owners who agree to construct or substantially rehabilitate housing* in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section.   The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

88 Stat. 662-63 (emphasis added).

        Thus, subsection (b)(1), which remains in effect as initially enacted, governs *existing* housing, and provides that in administering this segment of the Section 8 Program, HUD is, whenever possible, to enter into "annual contributions contracts" ("ACCs") with PHAs holding jurisdiction over the locality in question.  The PHAs, in turn, contract with owners of private housing "to make assistance payments … in accordance with this section."  This second contract, to which the owner is a party and through which that entity receives the assistance payment, is known as the Housing Assistance Payment ("HAP") contract.  24 C.F.R. § 880.201.  Under the terms of the

ACC, HUD provides the PHA with funds to cover (1) the housing assistance payments that the PHA, through the HAP, makes to owners, and (2) the costs of the PHA's administrative services related to the program. 24 C.F.R. § 982.151(a)(1). Importantly, under subsection (b)(1) HUD is authorized to bypass the PHA and enter directly into a HAP contract with an owner of existing housing *only* in jurisdictions where no qualified local PHA exists.

In contrast, subsection (b)(2), which has since been repealed – but which as explained below has enjoyed a rather complicated afterlife – governed both *new* and *substantially rehabilitated* housing. Under subsection (b)(2), HUD could subsidize low-income housing by *either* (i) entering into HAP contracts directly with owners or prospective owners of multifamily housing, including, in some instances, PHAs that themselves built or rehabilitated qualifying housing ("sentence one" projects), *or* (ii) establishing ACCs with local PHAs, pursuant to which the PHAs would, in turn, enter into HAP contracts with the owners or prospective owners of multifamily housing ("sentence two" projects). Thus, subsection (b)(2) authorized three possible, and non-exclusive, program designs: (1) private-owner / HUD projects, (2) PHA-owner / HUD projects, and (3) private-owner / PHA projects. See, e.g., 24 C.F.R. § 880.201 (noting these configurations).

At its inception, subsection 8(b)(1) was primarily intended to support tenant-based programs. In 1998, however, the Quality Housing Work Responsibility Act ("QHWRA"), Pub. L. No. 105-276, §§ 545, 550, relocated the authority for tenant-based programs to Section 8(o), codified at 42 U.S.C. § 1437f(o). However, subsection (b)(1) has also supported certain specific project-based programs.

With respect to subsection (b)(2), in the approximate decade following the enactment of the 1974 Act, HUD implemented its authority in, broadly speaking, two ways. First, under its "sentence one" authority, HUD entered into approximately 21,000 HAP contracts with owners who either constructed or substantially rehabilitated qualifying housing. Although HUD was authorized to enter into such contracts with both private owners and PHA-owners, as a matter of practice the vast majority of these "sentence one" HAP contracts were with private owners. See AR 1418, 53 Fed. Reg. 8050 (March 11, 1988) (noting that less than 10 percent of HUD's project-based HAP contracts were for PHA-owner / HUD projects). Pursuant to program regulations, HUD served as the "Contract Administrator" for all of these HAP contracts, the terms of which were generally 20 to 40 years. 24 C.F.R. § 880.201; 88 Stat. 665 (limiting HAP contracts to these terms unless owned or financed by a state or local agency); AR 1702 (HUD Occupancy Handbook).

Second, pursuant to its "sentence two" authority, HUD entered into ACCs with PHAs, which in turn entered into HAP contracts with private owners. Approximately 4,200 such HAP contracts originated in this manner. AR 428 (1999 Request for

Proposals, discussed below); HUD Supp. Mem. at 9-10.   The PHAs served as the Contract Administrator for these HAP contracts.  24 C.F.R. § 880.201.

## B.  The Housing and Urban-Rural Recovery Act of 1983

In 1983, Congress repealed the portion of Section 8 that provided ongoing authority for the inclusion of newly constructed and substantially rehabilitated housing within the program.   Specifically, Section 209(a) of the Housing and Urban-Rural Recovery Act of 1983 ("HURRA") made two revisions to Section 8.  First, it deleted the reference to "newly constructed, and substantially rehabilitated" housing in 42 U.S.C. § 1437f(a)(1).  Second, it repealed entirely the then-existing version of 42 U.S.C. § 1437f(b)(2).  Pub. L. No. 98-181, § 209(a)(1)-(2), 97 Stat. 1153, 1183 (1983).

However, while HURRA repealed HUD's authority to enter into any *additional* HAP contracts with owners or prospective owners of new or substantially rehabilitated housing (or to enter into ACCs with PHAs to do the same), it also included a savings provision that expressly preserved HUD's ability to continue funding the HAP contracts entered into pursuant to (b)(2) authority prior to the close of 1984.  Specifically, Section 209(b) of HURRA provided that: "[t]he amendments made by subsection (a) shall take effect on October 1, 1983, except that the provisions repealed shall remain in effect … with respect to any funds obligated for a viable project under section 8 of the United States Housing Act of 1937 prior to January 1, 1984[.]"  Id. § 209(b).

As is plain from the above, and as all parties agree, HURRA had no effect on HUD's authority to enter into ACCs with PHAs for existing housing pursuant to Section (b)(1) of the 1937 Act, and indeed, this authority remains intact today.  42 U.S.C. § 1437f(b)(1); see also HUD Mem. at 11.  The parties further agree that HURRA did not – or at least not immediately – affect HUD's ability to continue its administration of the existing HAP contracts that HUD had entered into pursuant its now-expired (b)(2) authority.  See HUD Mem. at 11 (following the enactment of HURRA, "HUD and PHAs under ACCs with HUD continued to have authority to administer existing HAP contracts that had been previously entered into for newly constructed and substantially rehabilitated housing").   Thus, in the aftermath of HURRA, "HUD … continued to administer those contracts to which it was a party, and PHAs continued to administer those contracts to which they were a party."  HUD Reply at 10.

However, as discussed below, the parties sharply disagree as to HURRA's longer-term effect on the programmatic design of project-based Section 8 assistance.

C.  The Multifamily Assisted Housing Reform and Affordability Act of
1997

Pursuant to former Section 8(e)(1) of the 1974 Act, new construction and substantial rehabilitation HAP contracts (the "(b)(2)" contracts) were limited to terms of 20 to 40 years.  Pub. L. No. 93-383, 88 Stat. 633, 665.  Although some of these original contracts are still in existence today, most of them, with the passage of time, began to expire in the mid- to late-1990s.  To address this problem, in 1996 Congress authorized a handful of limited demonstration programs providing for the renewal of certain project-based HAP contracts.  See Pub. L. No. 104-99, Title IV, § 405, 110 Stat. 26 (1996); Pub. L. No. 104-120, § 2(a), 110 Stat. 834 (1996); Pub. L. No. 104-204, Title II, § 211, 110 Stat. 2874 (1996).

Then, in 1997, Congress enacted the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA") in order to, *inter alia*, provide a permanent and generalized mechanism by which HUD could renew the expiring contracts.  Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384, 1408 (1997), 42 U.S.C. § 1437f note (Supp. III 1997).  As relevant to this case, § 524(a)(1) of MAHRA, entitled "Section 8 Contract Renewal Authority," provided that:

> [F]or fiscal year 1999 and henceforth, the Secretary may use amounts available for the renewal of assistance under section 8 or the United States Housing Act of 1937, upon termination or expiration of a contract for assistance under section 8 (other than a contract for tenant-based  assistance …) to provide assistance under section 8 of such Act at rent levels that do not exceed comparable market rents for the market area.  The assistance shall be provided in accordance with terms and conditions prescribed by the Secretary.

("Section 524").  In 1999, Congress replaced this language with a provision stating that:

> [HUD's] Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project.  The assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section.

Pub. L. No. 106-74, Title IV, Subtitle C, § 531(a), 113 Stat. 1047, 1109-10, 42 U.S.C. § 1437f note (2006).

Although certain other statutory provisions and amendments are relevant to this case, it is fair to say that the parties' basic dispute boils down to their competing

interpretations of HURRA and MAHRA – or more specifically, to their competing interpretations of how these two statutes interact with one another and the remainder of the 1937 Act.

HUD, for its part, makes two different arguments regarding this statutory overlay. Its first and primary argument begins with the premise that after HURRA's repeal of subsection 8(b)(2) in 1983, the agency's "statutory authority to enter into *new* rental assistance agreements survived only in Section 8(b)(1) of the Housing Act." HUD Reply at 7 (emphasis added).  HUD further argues here that when HUD renewed the expiring (b)(2) contract pursuant to MAHRA, the renewal contracts were necessarily "'*new*' contracts for *existing* projects" – *i.e.*, executed pursuant to HUD's (b)(1) authority – as opposed to "mere 'extensions' of [the] HAP contracts" the agency originally had executed under its now-expired (b)(2) authority.  Id. at 10 (emphasis added).  In support of this theory, HUD offers various textual arguments, which the Court will discuss and analyze below.  In the main, however, HUD's argument is that by the time it renewed the assistance for the projects initiated under subsection 8(b)(2), such projects had "been in existence for more than twenty years," and "common sense" therefore counsels that they were "'existing dwelling units,' as that phrase is used in Section 8(b)(1)."  HUD Reply at 11-12.

The import of this argument derives from the fact that subsection (b)(1) instructs HUD to enter into ACCs with PHAs, which in turn enter into HAP contracts to provide assistance payments to owners.  Under this provision, HUD is permitted to enter into a HAP contract directly with a project owner *only* when no qualified local PHA exists for a given jurisdiction.  Thus, in HUD's words, "[i]f the Renewal contracts are new contracts under Section 8 of the 1937 Act, that Section 8 authority can only come from Section 8(b)(1), and as such, HAP contract administration lies only with a  PHA."  Id. at 12.  Since all parties agree that "(b)(1)" ACCs between HUD and PHAs are properly considered cooperative agreements, this result would foreclose the Plaintiffs' claim that HUD must abide by procurement standards in its actions that are the subject of this suit.

The Plaintiffs offer various legal theories in opposition to this argument, but all agree on two central points.  First, with respect to HURRA's repeal of subsection 8(b)(2), the Plaintiffs contend that "[t]here is nothing in the statutory language or legislative history at the time of th[is] repeal … or thereafter to indicate that Congress made any attempt to move any of HUD's repealed authority under the repealed [sub]section 8(b)(2) to [sub]section 8(b)(1), or that Congress ever repealed the savings clause."  NHC Mem. at 5.  Second, they argue that MAHRA neither "effect[ed] a transformation of projects established under [sub]section (b)(2) into 'existing housing' under [sub]section (b)(1)," nor "otherwise compel[led] HUD to solicit cooperative agreements to obtain HAP contract administration services."   AHSC Reply at 7.  To the contrary, the Plaintiffs contend that "HUD remained responsible [under subsection (b)(2)] for ensuring that HAP

contract administration was performed, either by itself or by contracting with a third party."   Id.

HUD, however, also makes a second, alternative argument, to the effect that even if the Plaintiffs are correct that the contracts that are the subject of this suit are governed by (b)(2), nothing in that provision requires HUD to directly administer the renewal HAP contracts.   As explained above, subsection (b)(2) consists of two sentences: the first grants HUD authority to enter into HAP contracts directly with project owners, and the second – which, it is worth noting, is effectively identical to subsection (b)(1) – grants HUD authority to enter into ACCs with local PHAs, which in turn enter into HAP contracts with  project owners.  Here, HUD contends that:

> even if HUD was a contract administrator under the initial [HAP] contract, the 1937 Act does not mandate that either HUD or a PHA enter into a HAP contract, and it does not mandate that either HUD or a PHA administer the HAP contract.   [subs]ection (b)(2) provide[s] that either HUD or PHAs [may] be contract administrators…. Therefore, for contracts already in existence, HUD had discretion to choose between direct administration of HAP contracts and assignment of HAP contracts to PHAs for administration.

HUD Reply at 12.

The Plaintiffs, unsurprisingly, disagree, though their reasoning varies considerably from party to party.  In the main, the Plaintiffs contend that MAHRA "commands HUD to enter into HAP renewals," CMS Reply at 11, and therefore obliges HUD to act as the contract administrator for the renewal contracts.   As such, in contracting out this responsibility to the PHAs, Plaintiffs contend that HUD "is receiving a direct benefit" in the form of "services that HUD itself is otherwise required to perform," and is therefore engaged in a procurement activity under the standards of the Federal Grant & Cooperative Agreement Act, 31 U.S.C. §§ 6301-6308 ("FGCAA").  NHC Mem. at 24. The Court will analyze these arguments below, but first turns to the program and procedural history underlying this bid protest.

II.   Factual and Procedural History

A. "HUD 2020" Reforms and the 1999 Request for Proposals

On June 26, 1997, then-HUD Secretary Andrew Cuomo announced an agency-wide management reform plan called "HUD 2020."  AR 2766.  Among the key reforms announced in this plan was a commitment to cut HUD's staff by nearly one-third, "from the current 10,500 to 7,500 by the end of the year 2000."  Id.  Four months later, on October 27, 1997, Congress enacted MAHRA, instituting (among other reforms) the

renewal authority for project-based Section 8 assistance outlined above.  Consistent with Secretary Cuomo's "HUD 2020" reform plan, MAHRA's "Findings and Purposes" observed that "due to Federal budget constraints, the downsizing of [HUD], and diminished administrative capacity, the Department lacks the ability to ensure the continued economic and physical well-being of the stock of federally insured and assisted multifamily housing projects."  MAHRA § 511(10).  Congress further stated that MAHRA was intended to address such problems by introducing "reforms that transfer and share many of the loan and contract administration functions and responsibilities of the Secretary to and with capable State, local, and other entities."  Id. § 511(11)(C).

In March 1998, HUD's Office of Inspector General ("OIG") informed Congress that as part of its "extensive reorganization under [the] HUD 2020 Management Plan," the agency would issue a "Request for Proposals for outside contractors to administer HUD's portfolio of Section 8 contracts."  AR 2763 (internal Advisory Report on Section 8 Contract Administration, issued October 26, 1998, summarizing the March 1998 OIG Semiannual Report to Congress).  Thereafter, HUD's Fiscal Year 2000 Budget Request included a request for $209 million to fund an initiative to assign contract administration of its project-based HAP contracts to state-based governmental agencies.  AR 256, 258-59.  The Budget Request stated that HUD "plan[ned] to procure the services of contract administrators to assume [contract administration] duties, in order to release HUD staff for those duties that only government can perform and to increase accountability for subsidy payments."  Id. at 259.  The Budget Request further stated:

> The Department would solicit for competitive proposals from eligible public agencies to assume these contract administration duties…. The solicitation would specify exact duties, performance measures, and the method of selection and award.  The evaluation would be based upon the respondent's capabilities and proposed contract prices.

Id.

True to its word, on May 3, 1999, HUD issued a Request for Proposals ("RFP") for "Contract Administrators for Project-Based Section 8 Housing Assistance Payments (HAP) Contracts" ("1999 RFP").  AR 428 et seq., 64 Fed. Reg. 27,358 (May 19, 1999).  The 1999 RFP stated that "[t]his solicitation is not a formal procurement within the meaning of the Federal Acquisition Regulations (FAR) but will follow many of those principles," and sought proposals "to provide contract administration services" for "most of" the approximately 20,000 project-based Section 8 HAP contracts that HUD was, at that time, administering (i.e., the (b)(2) "sentence one" projects).  Id.  Although the RFP was initially limited to the "sentence one" projects, it expressly noted the existence of an additional 4,200 projects that were being administered by PHAs (i.e., the (b)(2) "sentence two" projects).  The RFP stated that PHAs "will generally continue to administer these HAP Contracts until expiration….[but] [w]hen HUD renews [these contracts] … HUD

generally expects to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." Id.

The RFP specified that the contract administration duties would be performed pursuant to a performance-based ACC ("PBACC"[4]) entered into with HUD, that "[b]y law, HUD may only enter into an ACC with a legal entity that qualifies as a "public housing agency" (PHA) as defined in the United States Housing Act of 1937 (42 U.S.C. [§] 1437 *et seq.*),"[5] and that responsive proposals would "cover an area no smaller than an individual State (or U.S. Territory)." AR 428-29, 64 Fed. Reg. at 27,358-59.

The RFP further provided that:

successful offerors under this RFP will oversee HAP Contracts, in accordance with HUD regulations and requirements…. After execution of the ACC, the CA [*i.e.*, Contract Administrator] will subsequently assume or enter into HAP Contracts with the owners of the Section 8 properties. The Contract Administrator will monitor and enforce the compliance of each property owner with the terms of the HAP Contract and HUD regulations and requirements.

AR 428, 64 Fed. Reg. at 27,358. Further:

---

[4] The 1999 RFP does not expressly use the term "performance-based ACC," nor, as far as the Court can determine, does any HUD document related to this protest adopt the abbreviation "PBACC" in reference to these ACCs. However, the 1999 RFP did state that "[f]or work performed under ACCs awarded in response to this RFP, HUD will use Performance-Based Service Contracting (PBSC)," defined as a contracting method that utilizes "measurable, mission-related [goals and] established performance standards and review methods to ensure quality assurance[,] [and which] … assigns incentives to reward performance that exceeds the minimally acceptable and assesses penalties for unsatisfactory performance." AR 430, 64 Fed. Reg. at 27,360. Moreover, later relevant HUD documents refer to the Contract Administrators for these ACCs by the more specific term Performance-Based Contract Administrators ("PBCAs").

As the 1999 RFP clearly demonstrates, and no party contests, since the ACCs in question in this bid protest have been performance-based since the 1999 RFP, the Court will use the term "PBCAAs" throughout the remainder of this opinion.

[5] As HUD noted in the 1999 RFP, the 1937 Housing Act defines a "public housing authority" as a "State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. § 1437a(b)(6)(A); see AR 429, 64 Fed. Reg. at 27,359.

However, the 1999 RFP also expressly provided that this limitation did "not preclude joint ventures or other partnerships between a PHA and other public or private entities to carry out the PHA's contract administration responsibilities under the ACC between the PHA and HUD." Id.

[t]he major tasks of the Contract Administrator under the ACC and this RFP include, but are not limited to:

- Monitor[ing] project owners' compliance with their obligation to provide decent, safe, and sanitary housing to assisted residents.

- Pay[ing] property owners accurately and timely.

- Submit required documents accurately and timely to HUD (or a HUD designated agent).

- Comply with HUD regulations and requirements, both current and as amended in the future, governing administration of Section 8 HAP contracts.

AR 429, 64 Fed. Reg. at 27,359.

Finally, although the 1999 RFP did not mention "staff downsizing," it stated that "[u]nder the approximately 20,000 Section 8 HAP Contracts this RFP covers, HUD pays billions of dollars annually to owners on behalf of eligible property residents. HUD seeks to improve its performance of the management and operations of this function through this RFP." Id. 428, 64 Fed. Reg. at 27,358. The RFP was silent regarding any statutory amendments or directives mandating that HUD issue the RFP or use ACCs to shift its HAP contract administration duties to PHAs.

As a result of the 1999 RFP, HUD ultimately awarded 37 PBACCs. AR 271. Between 2001 and 2003, HUD then awarded seven more PBACCs under a separate, substantially equivalent, RFP. Finally, between 2003 and 2005, it awarded nine additional PBACCs under a related invitation for the submission of applications.[6] Id. At some point not clearly established in the record, HUD received approval to extend the contracts for an additional ten years. Id. 272.

## B. The 2011 Invitation for Submission of Applications

On February 25, 2011, HUD issued an "Invitation for Submission of Applications: Contract Administrators for Project-Based Section 8 Housing Assistance Payments Contracts" ("2011 Invitation" or "Invitation"). AR 522-43. The Invitation was for the purpose of receiving new applications from PHAs to administer the Project-Based Section 8 Housing Assistance Payments Contracts as Performance-Based Contract

---

[6] The 1999 RFP, as well as the 2011 and 2012 notices discussed below, covered 53 "states" – the 50 states of this country, plus the District of Columbia, Puerto Rico, and the Virgin Islands.

Administrators ("PBCAs").   As relevant to this bid protest, the terms of the 2011 Invitation largely tracked those of the 1999 RFP.

After HUD awarded PBACCs under the 2011 Invitation for each of the covered jurisdictions, some of the disappointed PHAs filed protests at the Government Accountability Office ("GAO"), contesting the award of 42 PBACCs. AR 2843 (GAO Decision).  The protests generally alleged that the PBACCs were procurement contracts and not properly awarded in accordance with federal procurement law, that out-of-state PHAs were not legally qualified to administer the Section 8 program within a given state, and that HUD's evaluation of the applications was flawed.  Immediately thereafter, HUD began receiving a deluge of correspondence from various State Attorney Generals, offering opinions on whether their respective state law permits an out-of-state PHA to operate lawfully within its jurisdiction.  In every case, the Attorney General opined that his or her state's law did not permit such operation.[7]

On August 10, 2011, HUD awarded PBACCs for the 11 "states" for which it had received only one application from a qualified PBCA.  AR 220.  These ACCs remain in effect today, and are not involved in this litigation.  On the same date, HUD announced that it would not, at that time, award PBACCs in the remaining 42 jurisdictions, but would instead evaluate and revise its award process for these contracts.  Id. 2843. Accordingly, GAO dismissed the protests to allow HUD to take corrective action.  Id.

### C.  The 2012 Notice of Funding Availability

On March 9, 2012, HUD issued a "Fiscal Year (FY) 2012 Notice of Funding Availability (NOFA) for the Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-Based Section 8 Housing Assistance Payments Contracts" ("2012 NOFA"), the document that is the subject of this litigation.  AR 551-89.  The terms of the 2012 NOFA differ in four material ways from the 1999 RFP and 2011 Invitation.  First, the 2012 NOFA expressly invokes subsection (b)(1) as it authority for awarding the ACCs, stating, "[t]he PBCA program … effectuates the authority explicitly provided under section 8(b)(1) of the 1937 Act for HUD to enter into an ACC with a PHA [as defined by the Act]."  AR 552.  Second, the NOFA expressly states that the "ACCs HUD seeks to award are cooperative agreements," and that:

> a principal purpose of the ACC between HUD and the PHA is to transfer funds (project-based Section 8 subsidy and performance-based contract administrator fees, as appropriated by Congress) to enable PHAs to carry

---

[7] Links to these various state attorney general opinions transmitted to HUD can be found at: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA  (last visited April 17, 2013).

out the public purposes of supporting affordable housing as authorized by sections 2(a) and 8(b)(1) of the 1937 Act.

Id. 557.

Third, the NOFA establishes a preference for in-state applicants, stating that although "HUD believes that nothing in the 1937 Act prohibits" a PHA "from acting as a PHA in a foreign State:"

> HUD will consider applications from out-of-state applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant.  Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications HUD receives from an out-of-State applicant for that state.

Id. at 554 (emphasis added).[8]  Finally, in the Question and Answer section of the NOFA, the NOFA effectively creates an additional preference for a particular type of PHA – namely, a state Housing Finance Authority ("HFA").  In this section, HUD confirms that where the Attorney General of a given state submits a letter to HUD concluding that under that state's law, the state HFA alone possesses statewide jurisdiction as a PHA, HUD will award the ACC for the state to the HFA.  AR 617, 618, 622 (NOFA Q&As 163, 170, 191).

### D.  2012 GAO Protest

In May 2012, prior to the due date for the submission of applications under the 2012 NOFA, seven protesters[9] filed bid protests at the GAO, making substantially similar arguments as they make here – namely that the NOFA's preference for in-State PHAs, as well as its effective preference for state HFAs in particular, violated the terms of the Competition in Contracting Act, 41 U.S.C § 3301, ("CICA") as well as the terms of the Federal Acquisition Regulation ("FAR").

On August 15, 2012, the GAO issued a decision sustaining the protests.  AR 2838-52.  The GAO decision did not consider the complex statutory history outlined above, but instead focused on (1) the stand-alone terms of the 1999 RFP, 2011 Invitation, and 2012 NOFA, and (2) the standards distinguishing procurement contracts, grants, and cooperative agreements under the FGCAA, 31 U.S.C. §§ 6301-6308.

---

[8] The NOFA further provides that, if no qualified applicant applies "for any jurisdiction, HUD will administer the HAP contracts for that state internally, in accordance with past practice and the United States Housing Act of 1937."  AR 608.

[9] The GAO protesters included all of the Plaintiffs here, with the exception of California Affordable Housing Initiatives, Inc., which has protested the 2012 NOFA solely in this venue.

Summarizing the FGCAA standards, the GAO stated that HUD could properly characterize the ACCs at issue as cooperative agreements only if "the principal purpose of the[se] agreement[s] is to provide assistance to the recipient [*i.e.*, the PHA] to accomplish a public objective authorized by law." AR 2847. "In contrast, if the federal agency's principal purpose is to acquire goods or services for the direct benefit or use of the federal government, then a procurement contract must be used." Id. In particular, the GAO further opined that "if the agency otherwise would have to use its own staff to provide the services offered by the intermediary to the beneficiaries, then a procurement contract is the proper instrument." Id.

Applying these criteria, the GAO concluded that the purpose of the ACCs in question was not to "assist" PHAs because, *inter alia*, the PHAs served as mere "conduits" for the HAP payments from HUD to property owners, and certain statements made by HUD in advance of the 1999 RFP indicated that HUD saw its principal purpose in awarding the ACCs as facilitating a staff reduction. AR 2850-51.

HUD decided to disregard the GAO decision and proceed with the NOFA. The Plaintiffs then filed their respective actions challenging HUD's determination in this Court, again alleging that the ACCs in question are procurement contracts, and that the NOFA's preference for in-State PHAs, and for the statewide HFAs in particular, violated CICA and the FAR. On December 13, 2012, the Court consolidated the judicial actions and established a briefing schedule on the cross-motions regarding subject matter jurisdiction and for judgment on the administrative record. On February 19, 2013, the Court heard oral argument on the parties' respective motions.

The Plaintiffs in this case are as follows, and will be referred to by the abbreviations herein: CMS Contract Management Services and the Housing Authority of the City of Bremerton (collectively, "CMS"); Assisted Housing Services Corp., North Tampa Housing Development Corp., and California Affordable Housing Initiatives, Inc. (collectively, "AHSC"); Southwest Housing Compliance Corporation ("SHCC"); Navigate Affordable Housing Partners ("NAHP"); National Housing Compliance ("NHC"); and Intervenor Plaintiff Massachusetts Housing Finance Agency ("MHFA"). All Plaintiffs are PHAs within the meaning of the 1937 Housing Act. In addition, the Court permitted the *amicus* participation of the National Council of State Housing Authorities ("NCSHA").

## Analysis

HUD does not dispute that the 2012 NOFA fails to comply with CICA and the FAR, AR 1151, but instead argues that these statutory and regulatory requirements have no applicability to its actions here, as the contracts to be awarded under the NOFA are cooperative agreements, not procurement contracts. Accordingly, the Government has

moved, pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1), to dismiss all of the Plaintiffs' challenges to the propriety of the 2012 NOFA for lack of subject matter jurisdiction.  In the alternative, the Government moves pursuant to RCFC 52.1(c) for judgment on the administrative record.  The Plaintiffs have opposed these motions and cross-moved under RCFC 52.1(c) for judgment on the administrative record.  However, the Plaintiffs have, for the most part, made these motions separately, and offered somewhat divergent arguments supporting their respective positions.

The Court will address the Government's motion to dismiss for lack of subject matter jurisdiction, and the parties' cross-motions for judgment on the administrative record, in turn below.

I.      Subject Matter Jurisdiction

A defendant may raise either a facial or a factual challenge to a plaintiff's assertion that a court possesses subject matter jurisdiction over its claims.  See Cedars-Sinai Med. Ctr. V. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993).  In a facial challenge, where a defendant challenges the sufficiency of the facts alleged in the complaint to establish jurisdiction, the Court must accept the plaintiff's well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  Id. at 1583 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  However, where, as here, "the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction … the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion."  Id. (internal citations omitted); Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  In such a case, "[i]n resolving [any] disputed predicate jurisdiction facts, 'a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings.'"  Shoshone Indian Tribe, 672 F.3d at 1030 (quoting Cedars-Sinai Med. Ctr., 11 F.3d at 1584).   In addition, it is the plaintiff's burden to establish any challenged jurisdictional facts by a preponderance of the evidence.  Sci. Applications Int'l Corp. v. United States, 102 Fed. Cl. 644, 651 (Fed. Cl. 2011).

The Plaintiffs assert jurisdiction under the Tucker Act, which grants this Court jurisdiction to render judgment on "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act does not itself define "procurement," Resource Conservation Group, LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010).  However, in determining the scope of § 1491(b)(1), the Federal Circuit has adopted the definition of "procurement" contained in 41 U.S.C. § 403(2), which has been reorganized into 41 U.S.C. § 111.  Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008).  Section 111, in turn, provides that the term "'procurement' includes all stages

of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout."

The Government opposes the Plaintiffs' assertions of jurisdiction, arguing that this Court lacks the authority to adjudicate this case on the merits "because HUD's award of a cooperative agreement in the form of [an] ACC is not a 'procurement' within the meaning of the Tucker Act." HUD Mem. at 21.  However, although the parties jointly conceptualize the jurisdictional question in this case to be whether the PBACCs awarded by HUD under the 2012 NOFA are "procurement contracts" within the meaning of section 1491(b)(1) (or rather cooperative agreements), the Court finds that this issue is properly considered on the merits.

That is, the Court finds under the Tucker Act, it has jurisdiction to review a party's contention that a particular government contact is a procurement contract and therefore subject to CICA.  See 360Training.com, Inc. v. United States, 104 Fed. Cl. 575, 588 (2012) (holding that "the definition of 'procurement' under the Tucker Act is broader than the definition of 'procurement contract' in the FGCAA," such that "an agency can engage in a procurement process [for the purposes of the Tucker Act] even though it is using a cooperative agreement, instead of a procurement contract, to memorialize the parties' agreement").  Because the Plaintiffs have raised exactly such a claim, jurisdiction is proper, and the Court will analyze the question of whether the PBACCs are procurement contracts or cooperative agreements on the merits.

II.   Cross-Motions for Judgment on the Administrative Record

A. Standard of Review

In a bid protest, a court reviews an agency's procurement-related actions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides that a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id.; see also, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (internal citation omitted).  Under this standard, "[a] bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the Court determines whether a procurement-related decision either (a) lacked a rational basis, or (b) involved a violation of a statute or regulation.  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  "A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  Id. (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).

The inquiry at this first step is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and *de minimis* errors in a procurement-related process do not justify relief, Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States, 959 F.2d 929, 932–33, 935 (Fed. Cir. 1992)). If the Court finds that the agency acted without a rational basis or contrary to law, it must then, at the second step, "determine… if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. at 1353, 1358.

Moreover, in reviewing a motion for judgment on the administrative record made pursuant to RCFC 52.1(c), the court determines "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 355 (Fed. Cl. 2009). The existence of a material issue of fact, however, does not prohibit the Court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. Id. ("In a manner 'akin to an expedited trial on the paper record,' the court will make findings of fact where necessary.") (quoting CHE Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (Fed. Cl. 2007)). Thus, as relevant to this case, in order to prevail on the merits, Plaintiffs must demonstrate, by a preponderance of the evidence, (1) that the terms of the NOFA were unlawful, and (2) that such terms caused them to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine v. United States, 575 F.3d 1352, 1362 (Fed. Cir. 2009).

B. Discussion

As presented, HUD's argument on the merits is that if the NOFA is a procurement and therefore subject to CICA, the agency's decision to forego a CICA-compliant process is nonetheless lawful under the CICA exception that applies where there exist alternate "procurement procedures … expressly authorized by statute." HUD Mem. at 39 (citing 41 U.S.C. § 3301(a)). For their part, the Plaintiffs argue variously that HUD may not invoke this exception because the agency did not certify its applicability as required under the relevant regulations, see CMS Mem. at 36 (citing 48 C.F.R. §§ 6.301-1; 6.304); that HUD's characterization of the PBACCs as cooperative agreements violates the FGCAA, see NAHP Mem. at 35; and that the NOFA – and in particular, its in-state preference – violates CICA's mandate of "full and open completion" in government contracting, see id. at 42 (citing 41 U.S.C. § 3301).

For the reasons explained below, however, the Court finds that it need not resolve many of these questions in order to dispose of this case. Having found jurisdiction to determine whether the PBACCs are procurement contracts or cooperative agreements,

the Court must now proceed to analyze this question on the merits. If, following such an analysis, the Court finds that the PBACCs are procurement contracts, CICA would apply, and further related analysis would become necessary. However, because the Court does not reach this conclusion, but instead finds that HUD has properly classified the PBACCs as cooperative agreements, it need not reach any CICA-related issues raised by the parties.

Accordingly, the Court will explain why, after examining the Housing Act of 1937, as amended, and in light of the standards set forth in the FGCAA, it has determined that the PBACCs are best classified as cooperative agreements rather than procurement contracts.

## 1. FGCAA Standards

The Federal Grant and Cooperative Agreement Act of 1977, or FGCAA, "provides guidance to executive agencies in determining which legal instrument to use when forming a [contractual] relationship" between the agency and another party. 360Training.com, 104 Fed. Cl. at 579; 31 U.S.C. §§ 6301-6308. The FGCAA establishes what is sometimes referred to as the "principal purpose" test, providing that "[a]n executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government" and a recipient when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services *for the direct benefit of the United States Government*[.]" 31 U.S.C. § 6303 (emphasis added). Conversely, the FGCAA counsels that "[a]n executive agency shall use a cooperative agreement … when (1) "the principal purpose of the relationship is to *transfer a thing of value*" to the recipient in order "*to carry out a public purpose of support or stimulation authorized by a law* of the United States," and (2) "*substantial involvement* is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." Id. § 6305 (emphasis added).

The FGCAA standards are expressed in mandatory, not precatory, terms. Nonetheless, as HUD and at least some of the Plaintiffs recognize, these standards do not provide hard-and-fast, one-size-fits-all rules. Rather, because every agency has inherent authority to enter into procurement contracts, but must be specifically authorized by statute to enter into assistance agreements, the FGCAA standards must be applied within the context of the agency's specific statutory mandate in entering into the contractual relationship in question. U.S. Government Accountability Office, Principles of Federal Appropriations Law, Vol. II, p. 10-17 (2006) ("GAO Redbook") ("[T]he relevant legislation must be studied to determine whether an assistance relationship is authorized at all, and if so, under what circumstances and conditions."); see also HUD Mem. at 26 ("Although Congress enacted the FGCAA … to establish criteria for Federal agency use of grants, cooperative agreements, and procurement

contracts, the decision as to which legal instrument is appropriate depends, in the initial analysis, on the agency's statutory authority."); NHC Mem. at 39 ("There are two steps involved in conducting an FGCAA analysis, and we do not disagree that the first step in determining the correct funding instrument" is to examine "'whether the agency has statutory authority to engage in assistance transactions at all'") (quoting GAO Redbook at 10-17"); AHSC Mem. at 37 (similar).

In order to determine whether the PBACCs are procurement contracts or cooperative agreements, the Court will therefore begin with a close examination of the "precise statutory obligations" underlying these contracts,[10] as contained in the 1937 Housing Act, as amended. 360Training.com, 104 Fed. Cl. at 579. Once the nature of these obligations has been determined, the Court will then examine them in light of the standards delineated by the FGCAA. See GAO Redbook at 10-17 ("[D]eterminations of whether an agency has authority to enter into [cooperative agreements] in the first instance must be based on the agency's authorizing or program legislation. Once the necessary underlying authority is found, the legal instrument … that fits the arrangement as contemplated must be used, using the [FGCAA] definitions for guidance as to which instrument is appropriate.").

## 2. The PBACCs are Cooperative Agreements

HUD essentially offers two theories of its case. The first of these is based primarily on subsection 8(b)(1) and the second, on subsection 8(b)(2). The Court will address each of these arguments in turn below.

- ## Subsection 8(b)(1) Does Not Govern the ACCs for the New Construction and Substantial Rehabilitation Projects

HUD readily concedes that, pursuant to subsection (b)(2), it was the party that originally entered into, and was responsible for contract administration of, the HAP contracts in question. HUD Reply at 9. However, HUD argues that taken together, HURRA's repeal of Subsection 8(b)(2) and MAHRA's enactment of renewal authority for expiring project-based HAP contracts create a result where the renewal contracts (of which the HAPs at issue here are a subset) are necessarily "'*new*' contracts for *existing* projects," and hence governed by HUD's authority under Section 8(b)(1) of the Housing Act. HUD Reply at 7. Again, Subsection (b)(1) instructs HUD to enter into ACCs with

---

[10] Plaintiff NHC attempts to make much of the fact that the PBACCs were awarded, and have always been treated, as contracts with HUD. NHC Mem. at 17-18. However, as HUD correctly points out, this fact is of no moment, because "[a] grant agreement is an enforceable contract in this court." HUD Reply at 25 (quoting Knight v. United States, 52 Fed. Cl. 243, 251 (2002), *rev'd on other grounds*, 65 F. App'x 286 (Fed. Cir. 2003)). Thus, the relevant issue here is not whether the PBACCs are "contracts," but rather what *type* of contractual relationship they represent with the Government. The Court will therefore sometimes refer to the PBACCs as "contracts," but this term is without legal significance in its analysis.

PHAs, which in turn enter into HAP contracts to provide assistance payments to owners. Under this provision, *only* when no qualified local PHA exists for a given jurisdiction is HUD permitted to enter into a HAP contract directly with a project owner.  Moreover, all parties agree that "traditional" ACCs under subsection (b)(1) are properly considered assistance agreements, not procurement contracts.   See, e.g., CMS Reply at 2; AHSC Mem. at 35.  Thus, the import of this argument is that, in HUD's words, "[i]f the Renewal contracts are new contracts under Section 8 of the 1937 Act, that Section 8 authority can only come from Section 8(b)(1), and as such, HAP contract administration lies only with a PHA."  HUD Reply at 12.  And, if HAP contract administration lies with the PHAs (as opposed to HUD), then under the FGCAA standards HUD is not "outsourcing" these tasks for its own benefit, and  the PBACCs therefore are not procurement contracts.

HUD's argument here proceeds in two steps.  First, HUD maintains that "[a]fter [HURRA's] repeal of Section 8(b)(2) in 1983, [HUD's] statutory authority to enter into new rental assistance agreements survived only in Section 8(b)(1) of the Housing Act." Id. at 7.  Second, HUD argues that when MAHRA gave the agency authority to renew the expiring (b)(2) contracts, it effectively mandated that such renewals be made pursuant to subsection (b)(1), as "new" contracts for "existing" housing.   Id. Although these arguments are ultimately very closely linked, the Court will address them separately and in turn below.  As the Court will explain, it finds that this argument is fatally flawed by several strained constructions of the relevant statutory language.

- HURRA

In 1983 Congress in HURRA repealed HUD's ongoing authority under Subsection 8(b)(2) to support  privately owned new or substantially rehabilitated housing projects pursuant to either a HAP contract with the owner, or an ACC with a PHA (which in turn would enter into a HAP with the owner).  However, HURRA also enacted a savings clause, which provides in relevant part that  "the provisions repealed shall remain in effect … with respect to any funds obligated for a viable project under section 8 of the United States Housing Act of 1937 prior to January 1, 1984[.]"  HURRA § 209(b).  HUD contends that "[p]rior to January 1, 1984, no funds were obligated for a project beyond the term of the original HAP contract," and that therefore the savings clause carried legal force with respect to a particular HAP contract only for the length of the original term of that contract.  HUD Supp. Mem. at 1 n.1.

Plaintiffs, on the other hand, argue that HUD has identified no statute that ever fully repealed subsection (b)(2) – and, more importantly, that the subsequent statutory history of the Housing Act indicates that Congress has repeatedly and expressly "grandfathered" HUD's expired (b)(2) authority through many statutory revisions.  The first relevant amendment that Plaintiffs point to is the Community Housing and Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) (the "1992 Act" or "1992 Housing Act").  Although the 1992 Act implemented many reforms, its

relevance to this case lies in its addition of a single definition to the 1937 Act – to wit, that of "project-based assistance." The 1992 Act defined this term as "rental assistance under section (b) of this section [*i.e.*, Section 8] that is attached to the structure pursuant to subsection (d)(2) … ." Id. § 146, codified at 42 U.S.C. § 1437f(f)(6).[11] Subsection (d)(2), also an addition of the 1992 Act, states, in turn:

> In determining the amount of assistance provided under [either (i)] an assistance contract for project-based assistance under this paragraph or [(ii)] *a contract for assistance for housing constructed or substantially rehabilitated pursuant to assistance provided under subsection (b)(2) of this section (as such subsection existed immediately before October 1, 1983),* the Secretary may consider and annually adjust, with respect to such project, [for the cost of service coordinators for residents who are elderly or disabled].

Id. § 674, currently codified at 42 U.S.C. § 1437f(d)(2)(B)(i) (emphasis added).

HUD denies that these provisions are evidence of its authority under subsection (b)(2) continuing to be grandfathered into the 1937 Housing Act. In making this argument, it emphasizes the first portion of the definition added by section 146 of the 1992 Act: *i.e.*, that "project-based assistance" is "rental assistance *under subsection [8](b)*" (emphasis added). In HUD's interpretation, because by 1992 the agency's "statutory authority to enter into new rental assistance agreements survived only in [subs]ection 8(b)(1) of the Housing Act," HUD Reply at 7, the new definition of "project-based housing" did nothing more than make "explicit" the fact that, post-HURRA, "HUD's authority to enter into ACCs with PHAs for existing housing under [subs]ection 8(b)(1) … remained intact, for *both* project-based and tenant-based programs." HUD Mem. at 11 (emphasis added). In other words, according to HUD, by defining "project-based assistance" as "rental assistance under section [8](b)," section 146 of the 1992 Act simply confirmed that, notwithstanding the repeal of subsection (b)(2), HUD's remaining (b)(1) authority encompassed the authority to enter into "new" rental assistance agreements for (existing) project-based housing.[12]

---

[11] In full, 42 U.S.C. § 1437f(f)(6) currently defines "project-based assistance" as "rental assistance under section (b) of this section that is attached to the structure pursuant to subsection (d)(2) *or (o)(13)* of this section." (emphasis added). Subsection (o)(13) applies only to the tenant-based Section 8 program, and provides that a PHA may, subject to certain conditions, divert up to 20 percent of the funding the PHA receives from HUD for its tenant-based program to fund project-based tenant subsidies attached to existing, newly constructed, or rehabilitated housing. As subsection (o)(13) is not relevant here, the Court will exclude it from its analysis.

[12] HUD's only substantive attempt to deal with the entirety of subsection (d)(2) is an argument that "[t]he fact that subsection (d)(2) identifies several categories or projects, including 'existing housing' and new construction and substantially rehabilitated projects, is immaterial; they are all included within the scope of subsection (d)(2)." HUD Reply at 12 n.9. If there is any logic in or point to this statement, the Court fails to perceive it.

Some of the Plaintiffs, however, read these clauses very differently. Plaintiff AHSC summarizes the alternative reading of these amendments most succinctly, as follows:

> [Through subsection (d)(2),] Congress acknowledged that there were project-based programs not only 'under this paragraph,' *i.e.*[,] under the surviving (b)(1), but *also* under contracts 'for assistance for housing constructed or substantially rehabilitated pursuant to assistance provided under subsection (b)(2) of this section (as such subsection existed immediately before October 1, 1983).' In other words[,] Congress specifically recognized that the projects for new construction and substantial rehabilitation entered into before [the close of] 1983 continued to exist[, albeit] in a special category. They were not within Section 8(b)(1), and, therefore, not subject to [the] provisions for [the preferred] use of PHAs [established by Section] 8(b)(1)[.]

AHSC Mem. at 44-45; NHC Mem. at 5-6.

The Court agrees with the Plaintiffs on this point. By making express reference to housing funded under the expired subsection (b)(2) and including it within its definition of "project-based assistance," the 1992 Act "confirmed" nothing more than that HUD's authority under this provision continued to be grandfathered into the 1937 Act, its repeal notwithstanding.

Moreover, other more recently enacted statutes confirm this reading. MAHRA, for example, defines "project-based assistance" as "rental assistance described in paragraph (2)(B) of this section that is attached to a multifamily housing project." MAHRA § 512(11). Paragraph (2)(B) of section 512, in turn, defines "eligible multifamily housing projects" as inclusive of, *inter alia*, properties "that [are] covered in whole or in part by a contract for project-based assistance under … the new construction or substantial rehabilitation program under section (b)(2) of the United States Housing Act of 1937 (as in effect before October 1, 1983)." Id. § 512(2)(B)(i); see also 24 C.F.R. § 402.2 (MAHRA regulations, providing that "[p]roject-based assistance means the types of assistance listed in section 512(2)(B) of MAHRA, or a project-based assistance contract under the Section 8 program renewed under section 524 of MAHRA."). Similarly, a year later QHWRA defined "project-based assistance" as including, *inter alia*, "the new construction and substantial rehabilitation program under section 8(b)(2) (as in effect before October 1, 1983)." Pub. L. No. 105-276 § 513, 112 Stat. 2461, 2546.

Thus, HUD's interpretation of HURRA's savings clause is strongly belied by the subsequent statutory history of the Housing Act, in which Congress repeatedly

recognized the continued existence and viability of "(b)(2)" projects entered into before the close of 1983.

- ## MAHRA

The second prong of HUD's "(b)(1)" argument is that when MAHRA gave the agency authority to renew the expiring (b)(2) contracts, it effectively mandated that such renewals be made pursuant to subsection (b)(1).

Again, MAHRA was enacted in 1997 in order to, *inter alia*, provide a permanent and generalized mechanism by which HUD could renew expiring project-based HAP contracts – which, when originally authorized, carried terms of 20 to 40 years.  Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384, 1408 (1997), 42 U.S.C. § 1437f note (Supp. III 1997).  As relevant to this case, section 524(a)(1) of MAHRA, entitled "Section 8 Contract Renewal Authority," provided that:

> [HUD's] Secretary may use amounts available for the renewal of assistance under section 8 of the United States Housing Act of 1937, upon termination or expiration of a contract for assistance under section 8 (other than a contract for tenant-based  assistance …) to provide assistance under section 8 of such Act at rent levels that do not exceed comparable market rents for the market area.  The assistance shall be provided in accordance with terms and conditions prescribed by the Secretary.

Id.  In 1999, Congress replaced this language with a provision stating that:

> [HUD's] Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project.  The assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section.

Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 113 Stat. 1047, 1109-10, 42 U.S.C. § 1437f note (2006).

At this step of its argument, HUD points out that by the time, pursuant to section 524 of MAHRA, that it renewed its assistance for the projects it had initiated under subsection 8(b)(2), such projects had "been in existence for more than twenty years[.]" HUD Reply at 11-12.  According to HUD, "common sense" therefore counsels that these projects consisted of "'existing dwelling units,' as that phrase is used in [subs]ection 8(b)(1)." Id.  In addition, HUD points to two definitional provisions of MAHRA, as well as a clause in the HAP renewal contracts.  Specifically, HUD points out that under

MAHRA, (i) "[r]enewal" is defined as 'the *replacement* of an *expiring ... contract* with a *new* contract under Section 8 of the [1937 Act]…," and (ii) that an "expiring contract," in turn, is defined as "a project-based assistance contract that, by its terms, *will expire*." 42 U.S.C. § 1437f note (MAHRA § 512(12), (3), respectively) (emphasis added); see HUD Reply at 11.  Additionally, the post-MAHRA renewal contracts themselves contain the following clause:

> Previously, the Contract Administrator and the Owner had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project.  The term of the expiring contract will end prior to the beginning of the term of the Renewal Contract.

AR 2270-71 (Renewal Contract).  On the basis of these provisions, HUD contends that MAHRA thus "provide[d] for the expiring contracts *actually to expire* before new renewal contracts take effect." HUD Reply at 11.  (emphasis added).

However, as the Plaintiffs point out, the renewal contracts also state that the "[t]he purpose of the Renewal Contract is to *renew the expiring contract for an additional term*," AR 2271 (emphasis added).  And, an attachment to these contracts further provides that "[t]he Renewal Contract *must be entered [into] before expiration of the Expiring Contract*." AR 2282 (emphasis added).  That is, MAHRA does not define "expiring contract" as a contract that has expired; rather, it states that such a contract is one that will, at some point in the future, reach the end of its term.  Pursuant to the terms of the renewal contracts themselves, all such contracts were expressly required to be executed *prior* to the expiration of the contracts they replaced.  Moreover, as Plaintiffs note, "[n]owhere in MAHRA does Congress say that the expiring Section (b)(2) HAP contracts will be replaced with new contracts under Section (b)(1)." SHCC Reply at 5.  To the contrary, as discussed above, MAHRA expressly includes properties "that [are] covered in whole or in part by a contract for project-based assistance under … the new construction or substantial rehabilitation program under section (b)(2) of the United States Housing Act of 1937 (as in effect before October 1, 1983)"  as among those eligible for renewal assistance under its terms.  MAHRA § 512(2)(B)(i).

Thus, while HUD is correct that the renewal contracts were "new" contracts (as, indeed they could only have been, having come into existence only upon their execution), it simply does not follow from this fact that these contracts were somehow executed pursuant to subsection 8(b)(1), notwithstanding their origin under subsection 8(b)(2).  The Court therefore agrees with the Plaintiffs that the renewal contracts, true to their titles, simply renewed the assistance that "(b)(2)" projects had been receiving since their inception, and did so under the same subsection (if not necessarily under the exact same terms) as that under which such projects were originally authorized.  That is, the Court finds that notwithstanding its repeal, subsection 8(b)(2) continues to govern the various

contracts for the housing projects that were originally authorized and supported pursuant to the subsection's terms.

This conclusion does not, however, end the Court's analysis. Rather, the question now becomes whether, under the expired but grandfathered subsection 8(b)(2), HUD is given the authority or discretion to use cooperative agreements in providing the renewal assistance in question. The Court will now turn to that issue.

- Section 8(b)(2) Authorizes HUD to Use Cooperative Agreements with PHAs to Provide Assistance to the New Construction and Substantial Rehabilitation Projects.

Again, the full text of Subsection 8(b)(2) of the Housing Act reads:

To the extent of annual contributions authorizations under section 5(c) of this Act, the Secretary is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section. The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

88 Stat. 662-63.

The first sentence of subsection (b)(2) permitted HUD to subsidize low-income housing by entering into HAP contracts directly with owners or prospective owners of multifamily housing. Alternatively, the second sentence of this provision, which is effectively identical to the authority conveyed by subsection 8(b)(1), allowed HUD, at its option, to enter into ACCs with PHAs, which, in turn, enter into HAP contracts with owners. Compare id. with 42 U.S.C. § 1437f(b)(1) ("The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners …").

HUD's "(b)(2)" argument is that even if the HAP contracts at issue remain subject to subsection 8(b)(2), nothing in that provision *requires* HUD to directly administer the renewal of HAP contracts. HUD readily concedes that it provided support to the vast majority of the housing projects now at issue pursuant to sentence one of this subsection, and thus that, as the Plaintiffs emphasize, "[t]he [PBACCs that] were awarded under the 1999 RFP were for contract administration services that had previously been performed by HUD itself." NHC Mem. at 17. Nonetheless, HUD argues that because it:

is not, and has never been, *obligated* [under subsection 8(b)(2)] to act as the contract administrator for the projects at issue, contract administration services [for the relevant HAP contracts] are not, and cannot reasonably be construed as being, for HUD's benefit.… A cooperative agreement is the appropriate instrument [through which] to implement the second sentence of [subs]ection 8(b)(2).

HUD Supp. Mem. at 5-6 (emphasis added).

In other words, HUD's "(b)(2)" argument is that, having initiated support for certain projects under sentence one of this subsection, nothing in the relevant statutes or regulations required that, when the agency renewed such assistance, it continue to do so under the "sentence one" model, wherein HUD enters into a HAP contract directly with the owner, without the intermediation of a PHA. The import of this argument is that, as HUD admits, "if the statute mandates that HUD enter into the HAP contract, then HUD has the obligation to administer the contract." HUD Reply at 9 n.7. Under the standards set forth by the FGCAA, HUD further concedes that in such circumstances, the PBACCs would be for HUD's benefit, and thus properly classified as procurement contracts. However, HUD maintains that because no such mandate exists, it is free to use cooperative agreements to continue its "(b)(2)" assistance, and that the PBACCs at issue in the 2012 NOFA are, in fact, such agreements.

The Plaintiffs disagree, for reasons that are divergent and that, in several cases, have evolved over the course of this litigation. Essentially, however, they contend that if the Court were to determine "the [subsection 8](b)(2) authority currently applies to the newly constructed and substantially rehabilitated housing HAP contracts at issue here, then the Government has responsibility to administer them, and as such, is receiving a direct benefit from the PBCA[']s … [performance of] services that HUD itself is otherwise required to perform." NHC Mem. at 23-24. Their specific arguments in support of this position, broadly speaking, fall into two categories. First, Plaintiffs argue that MAHRA "commands HUD to enter into HAP renewals and, therefore … [gives] HUD … the obligation to administer the contract." CMS Reply at 11. Second, Plaintiffs argue that a variety of regulatory provisions confirm this conclusion. The Court will address each set of issues below.

- <u>MAHRA Mandates Only That HUD Provide Assistance</u>.

The Court has twice reproduced substantial portions of both the first and the second versions of MAHRA § 524, above, and will not repeat this text verbatim again here. Briefly, however, the relevant section of the earlier-enacted version of MAHRA stated only that HUD "may" use certain specified funds to provide renewal assistance for, *inter alia*, the expiring "(b)(2)" contracts. 42 U.S.C. § 1437f note; <u>see</u>, <u>e.g.</u>, AHSC Mem.

at 11n.10 (noting permissive language in first iteration of § 524).[13]   As some Plaintiffs note, however, in 1999 Congress revised this language to state that HUD's "Secretary shall, at the request of the owner … use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project."  Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 42 U.S.C. § 1437f note.   Plaintiffs employ this language to make two primary arguments, both of which prove unavailing.

First, Plaintiffs seize on the mandatory phrasing of section 524 – and in particular, its use of the word "shall" – to argue that pursuant to this provision, "upon request of a project owner, HUD *must renew the HAP contract* using Section 8 funds."  AHSC Reply at 9 (emphasis added).  While superficially appealing, the problem with this argument is that, carefully read, section 524 is simply not so specific.  Rather, Section 524 provides only that the "Secretary shall … *provide ... assistance*" for qualifying projects.  Pub. L. No. 106-74, Title IV, Subtitle C, § 531, 42 U.S.C. § 1437f note (emphasis added).   As explained above, subsection (b)(2) provides *two* mechanisms by which HUD may provide assistance to covered projects, only one of which is directly through a HAP contract between HUD and the owner.  Thus, while Section 524 makes the renewal of assistance mandatory for any owner who so requests it (subject to the availability of funds), it does not, as Plaintiffs claim, specify the mechanism through which HUD must provide the assistance.

Second, Plaintiffs emphasize the responsibility that Section 524 places on the HUD Secretary (as opposed to the PHAs) in initiating the provision of the renewal assistance.  See NAHP Reply at 5 ("MAHRA unequivocally put[] the obligation on 'the Secretary' to extend HAP contracts with owners who request it."); AHSC Reply at 9-10 ("[I]t is noteworthy that this central renewal language provides that it is *the Secretary* who shall renew these contracts.") (emphasis in original).  The Plaintiffs' point appears to be that "[i]f Congress had intended for local housing agencies to renew HUD's HAP Contracts, it would have stated '*local housing authorities* shall renew an expiring contract."  CMS Reply at 8 (emphasis in original).

---

[13] Plaintiff CMS misleadingly cites to a separate provision of MAHRA, § 524(a)(2), entitled "Exception Projects," which provides that, "notwithstanding [the permissive language in] paragraph (1)," for certain specified categories of multifamily housing (and these categories *only*) HUD was required, "upon request of the owner," to "renew an expiring contract in accordance with the terms and conditions prescribed by the Secretary[.]"  Pub. L. No. 105-65, Title V, § 524(a)(2); see CMS Mem. at 11. While a few of the categories of housing listed in this subsection appear to be programs at issue in this litigation, the list falls far short of including all such programs – a distinction conveniently omitted by CMS.  In any event, as explained above, the Court finds that the latter-enacted version of § 524 is the one relevant here, both because it remains in effect today and because it was enacted prior to the award of the PBCAAs under the 1999 RFP.  See AR 1704.  Accordingly, the Court finds the mandatory language in the 1997 version of § 524(a)(2) wholly irrelevant to this case.

Again, the Court finds that this argument falls well short of establishing that HUD cannot, pursuant to the second sentence of subsection (b)(2), use assistance agreements to provide renewal assistance. As a preliminary matter, Section 8 is a federal program (albeit one run largely in cooperation with the states). As such, the Secretary is necessarily involved in its administration, even for those portions of the program which the Plaintiffs concede operate pursuant to cooperative agreements. Second, it is a matter of established fact, contested by no party, that HUD was the original counterparty to, and contract administrator of, the vast majority of projects authorized under subsection 8(b)(2). As the Plaintiffs themselves are at great pains to emphasize, until such time as HUD entered into the PBACCs pursuant to the 1999 RFP, PHAs were simply not involved, in any capacity, in such "HUD / private owner" projects. Against this backdrop, however, Plaintiffs fail to explain how Congress could possibly have effected an intention to provide for more programmatic involvement on the part of the states (and their political subdivisions, the PHAs) by directing that the PHAs "renew" HAP contracts to which they were not a party in the first instance.

- Program Regulations and Other Design Features Confirm That HUD May Use Assistance Agreements to Provide Renewal Assistance.

Finally, Plaintiffs point to various regulations and HUD guidance documents in support of two related, but slightly different arguments. The first of these arguments is that HUD has, at a minimum, a regulatory duty to administer itself the HAP contracts in the NOFA portfolio. Here, Plaintiffs cite two regulations naming HUD as the "Contract Administrator." First, 24 C.F.R. § 880.201 defines a project-based Section 8 "Contract Administrator" as "[t]he entity which enters into the [HAP] Contract with the owner and is responsible for monitoring performance by the owner. The contract administrator is a PHA in the case of private-owner/PHA projects, and HUD in private-owner/HUD and PHA-owner/HUD projects." Second, 24 C.F.R. § 880.505(a) provides:

Contract administration. For private-owner/PHA projects, the PHA is primarily responsible for administration of the Contract, subject to review and audit by HUD. For private-owner/HUD and PHA-owner/HUD projects, HUD is responsible for administration of the Contract. The PHA or HUD may contract with another entity for the performance of some or all of its contract administration functions.

Taken together, Plaintiffs argue that these regulations establish HUD as the Contract Administrator of the HAP contracts in the 2012 NOFA profile, such that "while … HUD may contract out performance of its contract administration function to another entity, it cannot shed its responsibility to administer contracts for the projects in the NOFA portfolio." AHSC Reply at 5-6.

HUD, for its part, counters that under the terms of the PBACCs as well as the Renewal Contracts, the PHAs are clearly designated as the "Contract Administrators" and that, under applicable MAHRA regulations, these contract terms override any contradictory regulations stating that HUD carries this role. Specifically, HUD cites 24 C.F.R. § 402.3 ("Contract provisions"), which provides that "[t]he renewal HAP contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including changes in HUD regulations and other requirements during the term of the renewal HAP contract, *unless the contract provides otherwise*." (emphasis added). In light of this provision, HUD argues that "[b]ecause the Renewal HAP contract explicitly provides that the PHA, not HUD, is the contract administrator, any regulation to the contrary does not apply." HUD Reply at 18.

The Plaintiffs do not contest that the renewal contracts in fact designate the PHA, and not HUD, as the Contract Administrator. However, they counter that this nomenclature is without meaning, because as a matter of general principle the terms of the renewal contract cannot trump those of regulations which HUD has promulgated itself and is bound to follow. SHCC Reply at 9; AHSC Reply at 13; CMS Reply at 15. Thus, according to the Plaintiffs:

> the fact that the PHA is named as the contract administrator on a HAP contract means nothing more than that HUD outsourced its ultimate authority as the contract administrator to the PHA in accordance with applicable statutes and regulations. The PHA's role as a contract administrator on a HAP contract does not relieve HUD of its obligation to administer the HAP contracts and provide project-based housing assistance.

SHCC Reply at 9.

What the Plaintiffs miss, however, is that HUD is *not* arguing in general terms that a contract term can trump a regulation, but rather is pointing to a *specific* regulation expressly stating that the terms of the renewal contracts, in particular, take precedence over any conflicting regulations or other program requirements governing the Section 8 program.[14] See 24 C.F.R. § 402.3. The Court therefore agrees with HUD that the Renewal Contracts' designation of the PHAs as the Contract Administrator is legally meaningful, and overrides the regulations cited by Plaintiffs insofar as they state to the contrary.

Citing 24 C.F.R. § 880.505(c), HUD also contends that this transfer of contract administration duties is legally permissible. That regulation provides:

---

[14] Plaintiff AHSC attempts to argue that the phrase "unless the contract provides otherwise," as it is used in 24 C.F.R. § 402.3, applies only to subsequently enacted regulations and requirements. See AHSC Reply at 14. The Court finds this interpretation to contravene the plain language of the regulation.

> Conversion of Projects from one Ownership/Contractual arrangement to another. Any project may be converted from one ownership/contractual arrangement to another (for example, from a private-owner/HUD to a private-owner/PHA project) if:
>
>> (1) The owner, the PHA and HUD agree,
>>
>> (2) HUD determines that conversion would be in the best interest of the project, and
>>
>> (3) In the case of conversion from a private-owner/HUD to a private-owner/PHA project, contract authority is available to cover the PHA fee for administering the Contract.

24 C.F.R. § 880.505(c).

Here, HUD argues that "[b]y executing the Renewal Contracts at issue in the NOFA, the owner, the PHA, and HUD expressly agree that the PHA will act as contract administrator." HUD Supp. Mem. at 4 (citing AR 2268, 2270, 2271, 2278); see also id. at 4-5 (noting that under related regulations, a project "conversion" consists of "the transfer of the responsibility of administering the Contract") (citing 40 Fed. Reg. 18682, 18683 ¶ 15 (Apr. 29, 1975)). Plaintiffs counter that 24 C.F.R. § 880.505(c) calls for a more formalized conversion process which HUD has not followed, and is therefore irrelevant to this bid protest. AHSC Supp. Mem. at 5-6. Although the Court finds that section 880.505(c) is somewhat ambiguous on this point, it agrees with HUD that the agency's initiation of the PBCA program pursuant to the 1999 RFP, and subsequent execution of the PBACCs with chosen PHAs, were sufficiently formalized mechanisms that met the requirements of subsections (1)-(3) of this regulation. At any rate, the Court holds that, at a minimum, Plaintiffs have failed to demonstrate that HUD's procedure here was a "clear and prejudicial violation of applicable … regulations," as required under this Court's standard of review for bid protests. See Axiom Res. Mgmt., 564 F.3d at 1381.

Finally, Plaintiffs' argue that "[u]nlike a traditional ACC, a PBACC does not actually provide assistance to PHAs or owners. Instead, it provides a fee to contractors to administer the assistance that HUD is already obligated to provide." CMS Reply at 4-5. In essence, Plaintiffs' argument is that, in practice, the role of the PBCAs in administering the HAP contract is merely "ministerial," and therefore primarily for HUD's benefit – and, by extension, necessarily a procurement contract under the standards of the FGCAA. In support of this argument, Plaintiffs repeatedly cite Section 4350.3 of the HUD Handbook ("Occupancy Requirements of Subsidized Multifamily Housing Programs"), subsection 1-4(B) of which provides:

HUD has primary responsibility for contract administration but has assigned portions of these responsibilities to other organizations that act as Contract Administrators for HUD. … There are two types of Contract Administrators that assist HUD in performing contract administration functions.

1. <u>Traditional Contract Administrators</u>.   These Contract Administrators have been used for over 20 years and have Annual Contribution Contracts (ACCs) with HUD.   Under their ACCs, Traditional Contract Administrators are responsible for asset management functions and HAP contract compliance and monitoring functions.   They are paid a fee by HUD for their services.

2. <u>Performance-Based Contract Administrators (PBCAs)</u>.   The use of PBCAs began as an initiative in 2000.   Under a performance-based ACC, the scope of responsibilities is more limited than that of a Traditional Contract Administrator. A PBCA's responsibilities focus on the day-to-day monitoring and servicing of Section 8 HAP contracts. PBCAs are generally required to administer contracts on a state-wide basis and have strict performance standards and reporting requirements as outlined in their ACC.

AR 2492.

The "Traditional Contract Administrators"  ("TCAs") referred to here are PHAs that, pursuant to either subsection 8(b)(1) or sentence two of subsection 8(b)(2), entered into ACCs with HUD and, concurrently, HAP contracts with project owners.  As the Handbook indicates, and as Plaintiffs stress in their briefs, the authority retained by the TCAs is somewhat more expansive than that held by the PBCAs pursuant to the PBACCs.  For example, under the PBACCs, HUD retains the responsibility to determine when project owners are in default, 24 C.F.R. § 880.506(a); AR 20201, and is the only party capable of terminating a HAP contract, 24 C.F.R. § 880.506(b).  In addition, although the PBCAs sign the HAP contracts as the Contract Administrator on HUD's behalf, since 2007 HUD has also signed every renewal HAP contract because, in the determination of HUD counsel, these contracts "represent the official point of obligation of federal funds."  <u>See</u> Docket No. 57-2 at 3 (email from Lanier Hylton dated November 20, 2007); <u>see</u> <u>also</u> Order dated February 19, 2013 (granting motions to supplement the administrative record, including with the Hylton email).

The Court acknowledges the limitations on the authority of the PBCAs and HUD's continued oversight role in the administration of the PBCA program.  However, in light of the statutory and regulatory scheme analyzed above, the Court finds that such

limitations fall well short of establishing that the PBCA program primarily benefits HUD, rather than serving as a mechanism through which HUD, in cooperation with the states, carries out the statutorily authorized goal of supporting affordable housing for low-income individuals and families.

First, as HUD points out, since its enactment in 1937, the stated policy of the Housing Act has been for HUD and its predecessor agencies to work cooperatively with states and their political subdivisions to promote various housing and community development-related goals. As originally enacted, the Housing Act's "Declaration of Policy" provided that:

> It is hereby declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this Act, to *assist the several states and their political subdivisions* to … remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.

Pub. L. No. 75-412, 50 Stat. 888 (1937) (emphasis added); see also id. (preamble, stating the purpose of the Act to be the provision of "*financial assistance to States and political subdivisions thereof* for the elimination of unsafe and insanitary housing conditions, for the eradication of slums, for the provision of decent, safe, and sanitary dwellings for families of low income …") (emphasis added).

In 1998 Congress somewhat modified this policy statement. It currently reads:

(a) Declaration of Policy – It is the policy of the United States –

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this Act –

  (A) *to assist States and political subdivisions of States* to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

  (B) *to assist States and political subdivisions of States* to address the shortage of housing affordable to low-income families; and

  (C) Consistent with the objectives of this title, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public.

QHWRA, 112 Stat. 2461, 2522-23 (1998), codified at 42 U.S.C. § 1437 (emphasis added).

HUD contends, and the Court agrees, that these revisions serve to reiterate and "further emphasiz[e] the primary role the states and their political subdivisions are to play" in implementing the federal government's housing policies.  HUD Mem. at 14.  More important, however, is the fact that the consistent policy of the Housing Act has been for HUD (and its predecessor agencies) to implement federal housing goals through close cooperation and coordination with the states.  Moreover, although the Plaintiffs attempt to make much of HUD's various statements throughout the years regarding the cost-saving effects of the PBCA program, see NHC Mem. at 2; SHCC Mem. at 9, the Court finds nothing inconsistent in HUD sharing greater responsibility for program administration with the states while at the same time achieving certain cost efficiencies.  Indeed, as HUD points out, such twin goals were expressly set forth in MAHRA, which called on HUD to address "Federal budget constraints … and diminished administrative capacity" through "reforms that transfer and share many of the loan and contract administration functions and responsibilities of the Secretary to and with capable State, local, and other entities."  MAHRA § 511(10), (11)(C).

In addition, as HUD correctly points out, it has always limited the award of the PBACCs to PHAs, and has done so under the express reasoning that "[b]y law, HUD may only enter into an ACC with a legal entity that qualifies as a 'public housing agency' (PHA) as defined in the United States Housing Act of 1937."  AR 428-29, 64 Fed. Reg. at 27,358-59.  Were HUD obtaining the services of the PBCAs strictly for its own "ministerial" convenience, the Court does not see how such a restriction would apply – and, indeed, HUD has stated that were the Court to find that it must issue the PBACCs as procurement contracts, HUD does not believe it would be in the agency's self-interest to continue the restriction going forward.  See HUD Supp. Mem. at 8.  Thus, the PHA-only rule would appear to make sense only if one conceives of these entities as HUD's governmental partners in the administration of housing programs intended to convey a benefit to low-income families and individuals.  And, as HUD notes, consistent with such a design, the PBCA program is in fact "administered by a program office, not a contracting officer. … [and] all statutory amendments and changes in policies or procedures [to the program] have been implemented not through a FAR-mandated changes clause, but through notices, handbooks, and regulations."  HUD Mem. at 20.

- The PBACCs are Consistent With the Standards for Cooperative Agreements Set Forth in the FGCAA.

As explained above, the FGCAA establishes a "principal purpose" test for the determination of whether a particular governmental contract is properly categorized as a procurement contract or a cooperative agreement.  When "the principal purpose of the

instrument is to acquire (by purchase, lease, or barter) property or services *for the direct benefit of the United States Government*," an agency must use a procurement contract. 31 U.S.C. § 6303 (emphasis added).  Conversely, when (1) "the principal purpose of the relationship is to *transfer a thing of value*" to the recipient in order "*to carry out a public purpose of support or stimulation authorized by a law* of the United States," and (2) "*substantial involvement* is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement," the agency may use an assistance agreement.  Id. § 6305 (emphasis added).

Citing these standards, the Government argues that the contracts in question hew much more closely to the latter definition.  Specifically, HUD posits that it "has not and is not acquiring any services when it grants administrative authority and transfers funds to PHAs via the ACCs," but "[r]ather … is engaged in a core statutory duty of providing funding assistance to state-sponsored PHAs[.]"  HUD Mem at 22.  Moreover, HUD argues that it "has retained authority to make certain decisions [and] to control the administration of the program … to ensure that Federal funds are spent in strict accordance with the terms of the HAP contracts and Federal law," which dovetails with the FGCAA's instruction that "substantial involvement" on the part of the Government is indicative of a cooperative agreement, not a procurement contract.  Id. at 32.

The Court agrees with HUD that the PBACCs are properly categorized as cooperative agreements under the standards set forth in the FGCAA.  Notwithstanding the fact that HUD originally directly administered the majority of the HAP contracts in the 2012 NOFA portfolio, it is unburdened by any statutory or regulatory obligation to maintain this responsibility in going forward in perpetuity.  When MAHRA authorized HUD to renew the expiring HAP contracts, it did not specify any particular model for HUD to use in providing the renewal assistance.  Consistent with the policy goals set forth in the Housing Act, HUD instituted the PBCA program and, in so doing, enlisted the states and their political subdivisions, the PHAs, to take on greater program responsibility.  That HUD achieved certain cost savings in so doing does not convert the PBCA program into a procurement process that primarily benefits HUD, as opposed to the recipients of the Section 8 assistance.

III.    Motions to Supplement the Administrative Record

Finally, the Court will briefly address two post-argument motions to supplement the administrative record, made by Plaintiffs NHC and AHSC.  Each of these Plaintiffs seeks to have the Court admit a two-page February 7, 2007 HUD memorandum outlining certain procedures in HUD's transfer of HAP contracts from the PHAs that had originally (or "traditionally") administered them, to the PHA that was serving as the PBCA with jurisdiction for the geographic area in which certain projects were located.  See Docket Entry 90-2 (the February 7, 2007 memorandum).  HUD opposes these motions, arguing that they are untimely; that the memorandum is not "necessary to permit meaningful

judicial review," per the standard established in <u>Axiom Resource Management, Inc. v. United States</u>, 564 F.3d 1374, 1379 (Fed. Cir. 2009); and that, in any event, the memorandum actually supports its position.

The Court agrees with HUD that, in a case as extensively briefed and with an administrative record as large as this one, the February 7, 2007 memorandum cannot meet the <u>Axiom</u> standard for supplementation.  It also agrees with HUD that, for the reasons the Court will not belabor but which follow from its above analysis, the memorandum neither undermines nor contradicts the Government's position in this case. The Court therefore DENIES these motions.

Conclusion

For the reasons stated herein, the Court finds that the 2012 NOFA properly characterizes the PBACCs as cooperative agreements.  The NOFA is compliant with the FGCAA, and is not subject to CICA.  Accordingly, the Court DENIES HUD's motion to dismiss for lack of subject matter jurisdiction; DENIES the Plaintiffs' respective motions for judgment on the administrative record; and GRANTS HUD's motion for judgment on the administrative record.  In addition, the Court DENIES Plaintiffs NHC and AHSC's motions to supplement the administrative record.

No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler<br>THOMAS C. WHEELER<br>Judge